**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　Plaintiff,　　　　　:　　　**20-CR-351 (SHS)**
　　　　　　　　　　　　　　　　　　　　　　　:
v.　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
ROBERT NEWLAND,　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　Defendant.　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT ROBERT NEWLAND'S MEMORANDUM ON SENTENCING

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

FACTS ................................................................................................................. 6

    A.     ROB'S PERSONAL HISTORY AND CHARACTERISTICS ............................ 6

          1.    WALES ......................................................................................... 6

          2.    UNIVERSITY, BUSINESS SCHOOL & EARLY CAREER ................. 8

          3.    FAMILY & COMMUNITY ............................................................ 10

    B.     THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ...................... 27

          1.    STARTING OUT IN THE GALLERY WORLD AND MEETING PHILBRICK ............................................................................... 27

          2.    ROB AND PHILBRICK'S RELATIONSHIP ..................................... 31

          ██    ████████████████████████████████████████████

          4.    JOINING PHILBRICK'S FRAUD ................................................... 39

          5.    WHY DID HE DO IT? .................................................................. 40

          ██    ████████████████████████████████████████████

ANALYSIS ........................................................................................................ 48

    A.     A LENGTHY SENTENCE OF HOME CONFINEMENT WITH COMMUNITY SERVICE IS JUST PUNISHMENT ...................................... 48

          1.    ROB'S ROLE – IN CONTRAST TO PHILBRICK'S – WARRANTS LENIENCY ................................................................ 49

          2.    THE EXTREME ABERRATION FROM ROB'S EXTRAORDINARILY SELFLESS, GENEROUS, FAMILY AND COMMUNITY-FOCUSED LIFE WARRANTS LENIENCY ................................................................................. 51

          3.    ROB HAS ALREADY ENDURED YEARS OF REAL, LIFE-CHANGING PUNISHMENT .......................................................... 55

          4.    INCARCERATION IS UNNECESSARY FOR FAIR AND APPROPRIATE PUNISHMENT ................................................... 57

          5.    NO NEED FOR THE DETERRENCE EFFECT OF INCARCERATION ......................................................................... 60

          6.    INCARCERATION IN THE U.S. WOULD BE DISPROPORTIONATE PUNISHMENT IN MULTIPLE WAYS ......... 62

          7.    THE GUIDELINES RANGE SHOULD BE CONSIDERED AND THEN DISREGARDED .............................................................. 66

8.      A NON-INCARCERATORY SENTENCE WOULD NOT CREATE UNWARRANTED DISPARITIES ........................................ 69

CONCLUSION ....................................................................................................................... 71

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
552 U.S. 38 (2007).........................................................................49, 66, 71

*Handa v. Clark*,
401 F.3d 1129 (9th Cir. 2015) ....................................................................64

*Kimbrough v. United States*,
552 U.S. 85 (2007)......................................................................................67

*Mejia-Rodriguez v. Holder*,
558 F.3d 46 (1st Cir. 2009) ........................................................................64

*Patel v. Holder*,
707 F.3d 77 (1st Cir. 2013) ........................................................................63

*Pepper v. United States*,
562 U.S. 476 (2011)....................................................................................66

*Rita v. United States*,
551 U.S. 338 (2007)....................................................................................66

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006)...................................................67, 69

*United States v. Alba*,
933 F.2d 1117 (2d Cir. 1991)......................................................................58

*United States v. Algahaim*,
842 F.3d 796 (2d Cir. 2016)........................................................................67

*United States v. Anderson*,
No. 18-cr-71, 2021 WL 776975 (W.D.N.Y. Mar. 1, 2021)..................567

*United States v. Anderson*,
260 F. Supp. 2d 310 (D. Mass. 2003) ...................................................57, 61

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008)........................................................................70

*United States v. Collins*,
07-cr-01170 (S.D.N.Y.) ..............................................................................51

*United States v. Conti*,
14-cr-00272 (S.D.N.Y. Apr. 28, 2014) ...........................................................63, 66

*United States v. Corsey*,
723 F.3d 366 (2d Cir. 2013) ......................................................................68, 69

*United States v. Costello*,
16 F. Supp. 2d 36 (D. Mass. 1998) ....................................................................51

*United States v. Desmond*,
No. 05 CR 729-4, 2008 WL 686779 (N.D. Ill. Mar. 11, 2008) ...............................69

*United States v. Diambrosio*,
No. 04-cr-66, 2008 WL 732031 (E.D. Pa. Mar. 13, 2008) ....................................55

*United States v. Emmenegger*,
329 F. Supp. 2d 416 (S.D.N.Y. 2004) ...........................................................61, 69

*United States v. Faibish*,
12-cr-265 (E.D.N.Y.) ......................................................................................68

*United States v. Fan Wang*,
1:14-cr-00411-WHP-1 (S.D.N.Y. 2014).............................................................54

*United States v. Fernandez*,
443 F.3d 19 (2d Cir. 2006), *abrogated on other grounds by Rita v. United
States*, 551 U.S. 338 (2007) ............................................................................61

*United States v. Gaind*,
829 F. Supp. 669 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) .........56, 57, 61

*United States v. Gardellini*,
545 F.3d 1089 (D.C. Cir. 2008) .......................................................................62

*United States v. Graham*,
06-cr-00137 (D. Conn.)...................................................................................51

*United States v. Harkonen*,
08-cr-00164 (N.D. Ca.) ..................................................................................70

*United States v. Johnson*,
No. 16-CR-547-1, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ....................61, 68

*United States v. Kelly*,
16-cr-00837 (S.D.N.Y. Dec. 19, 2016)...............................................................70

*United States v. Kipnis*,
05-cr-00727 (N.D. Ill.).....................................................................................71

*United States v. Leitch*,
    2013 WL 753445 (E.D.N.Y. 2013).............................................................................58

*United States v. Mack*,
    No. 17-cr-138, 2020 WL 6161255 (E.D.N.Y. Oct. 21, 2020)...................................57

*United States v. Milne*,
    384 F. Supp. 2d 1309 (E.D. Wisc. 2005).................................................................51

*United States v. Moreno-Garcia*,
    551 F. App'x 387 (9th Cir. 2014)............................................................................70

*United States v. Mullings*,
    131 F. Supp. 3d (E.D.N.Y. 2015) ......................................................................54, 71

*United States v. Musgrave*,
    647 F. App'x 529 (6th Cir. 2016) ...........................................................................71

*United States v. Navarro-Diaz*,
    420 F.3d 581 (6th Cir. 2005) ..................................................................................63

*United States v. Nesbeth*,
    188 F. Supp. 3d 179 (E.D.N.Y. 2016) .....................................................................54

*United States v. Panousos*,
    17-cr-10227 (D. Mass.)...........................................................................................70

*United States v. Parris*,
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) .....................................................................67

*United States v. Prosperi*,
    686 F.3d 32 (1st Cir. 2012)................................................................................58, 70

*United States v. Ramirez-Ramirez*,
    365 F. Supp. 2d 728 (E.D. Va. 2005) ......................................................................63

*United States v. Ramos*,
    No. 12-cr-556, 2020 WL 7128967 (S.D.N.Y. Dec. 4, 2020)....................................57

*United States v. Roth*,
    No. 05 CR 792-5, 2008 WL 686783 (N.D. Ill. Mar. 11, 2008) ..........................70, 71

*United States v. Sales*,
    17-cr-10110 (D. Mass.)...........................................................................................70

*United States v. Sarao*,
    No. 15 CR 75 (N.D. Ill. Jan. 28, 2020) ...................................................................58

*United States v. Schulman*,
   16-cr-00442 (E.D.N.Y.) ........................................................................55

*United States v. Sclamo*,
   997 F.2d 970 (1st Cir. 1993) ..............................................................58

*United States v. Sheppard*,
   612 F. Supp. 194 (S.D. Va. 1985) ......................................................70

*United States v. Smith*,
   387 F.3d 826 (9th Cir. 2004) ..............................................................54

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009) ...........................................................56, 62

*United States v. Villazan*,
   No. 05 CR 792-1, 2008 WL 686781 (N.D. Ill. Mar. 11, 2008) ..........70

*United States v. Warner*,
   792 F.3d 847 (7th Cir. 2015) .........................................................57, 61

*United States v. Watt*,
   707 F. Supp. 2d 149 (D. Mass. 2010) ...............................................68

*United States v. Whigham*,
   754 F. Supp. 2d 239 (D. Mass. 2010) ...............................................66

*United States v. Zimmerman*,
   No. 10-cr-598, 2012 WL 3779387 (E.D.N.Y. June 19, 2012) ............58

*Viveiros v. Holder*,
   692 F.3d 1 (1st Cir. 2012) ..................................................................64

**Statutes**

8 U.S.C. § 1226(c) ....................................................................................63

8 U.S.C. § 1226(c)(1)(A) ..........................................................................63

18 U.S.C. § 3553, et seq...................................................................*passim*

18 U.S.C. § 3563(b)(12) ...........................................................................59

18 U.S.C. § 3624(c)(1) ..............................................................................63

18 USC § 3632(d)(4)(A) ...........................................................................62

18 USC § 3632(d)(4)(A)(i) ..................................................................62, 63

18 USC § 3632(d)(4)(C) ................................................................................................63

18 USC § 3632(d)(4)(E) ................................................................................................63

**Other Authorities**

Camilo Montoya-Galvez, *Watchdog recommends relocation of detainees from ICE facility, citing unsanitary conditions and staff shortages*, CBS NEWS (Mar. 18, 2022), https://www.cbsnews.com/news/immigration-and-customs-enforcement-detention-center-watchdog-recommends-relocation-of-detainees/ ...................64

*Conditions in Migrant Detention Centres*, AMERICAN OVERSIGHT (May 23, 2023), https://www.americanoversight.org/investigation/conditions-in-migrant-detention-centers ........................................................................................64

Court & Community: An Information Series about U.S. Probation and Pretrial Services: Community Service, Office of Probation and Pretrial Services, Administrative Office of the U.S. Courts (2007), *available at* http://www.kywp.uscourts.gov/court_comm/ccmtmsvc.pdf ...................................59

Dalya Alberge, *He's sabotaged his entire life for greed': the $86m rise and fall of Inigo Philbrick*, THE GUARDIAN (May 25, 2022), https://www.theguardian.com/artanddesign/2022/may/25/inigo-philbrick-jailed-art-fraud ...........................................................................................32

Eileen Sullivan, *A.C.L.U. Says Immigration Detention Facility Should Be Shut Down, NYT* (Sept. 22, 2022), https://www.nytimes.com/2022/09/22/us/politics/aclu-ice-immigration-detention.html ..............................................................................................64

ERNEST HEMINGWAY, THE SUN ALSO RISES 42 (Scribner 1926) ..................................39

Frank O. Bowman, III, *Sentencing High-Loss Corporate Frauds After* Booker, 20 FED. SENT'G REP. 167 (2008)........................................................................68

Sarah Douglas, *Who Is Inigo Philbrick? Meet the Man Behind One of the Biggest Potential Modern Art Scandals*, ARTnews (Dec. 3, 2019), https://www.artnews.com/art-news/news/inigo-philbrick-dealer-lawsuits-explained-1202670107/2/ ...................................................................................32

US migrant centres: Photos show 'dangerous' overcrowding, BBC (Jul. 2, 2019), https://www.bbc.com/news/business-48842434....................................................64

## INTRODUCTION

Your Honor asked a question of Rob Newland at his guilty plea: Why did you do it?

Rob answers this question himself in depth in a letter to the Court, attached hereto as Exhibit A. The following pages seek to provide additional context and also – with significant help from 96 letters of support – to reveal who Rob is.

We submit that with a full understanding of both, the Court will conclude that this case merits an unusual degree of leniency.

* * *

Rob Newland admitted his guilt because he knowingly lied to victims as part of a scheme to defraud them that played out over years.

However, Rob Newland is also an extraordinary and admirable person. He worked and studied hard to achieve significant success from humble beginnings. He is a devoted father, husband, son, brother, and colleague. He lives modestly and is well-loved by his community. He is endlessly energetic and always curious, thoughtful, and eager to help. He assumes responsibility freely and carries it uncomplainingly. He is ambitious, adventurous, stalwart and unafraid of risk. He never gives up. He tries to do the right thing and he owns his mistakes, including forthrightly telling his family and community that he pled guilty because he is guilty, without excuses.

So, what led this exceptional man to commit such a serious crime?

In Rob's letter, and in the pages that follow, the answer is a sad but all too human story.

To begin, Rob Newland did not set out to commit a fraud. A lifelong high achiever, at age 34 and with a second daughter on the way, he took a second step towards family and away from his high-powered career (he had first left McKinsey; now he was leaving a business consulting job inside Christie's). Rob was raised in a closeknit family in rural Wales, and places family above all else. The move away from Christie's made sense – he wanted a calmer job so he could be more available as a dad and husband. But given his exceptional talent, training and track record (prior to McKinsey he studied both at the London School of Economics and HEC Paris, a top international business school), Rob's step off the fast track still meant moving to an exciting and well-paid new position as the commercial director for a top London art gallery named ███████.

1

His first assignment for his new boss, a leading figure in the gallery world named ███ ███ was to find a way to retain his most valuable employee, a superstar young art trader named Inigo Philbrick. ███ was worried that Philbrick would leave, taking with him the astronomical profits he had been generating for years. Over the course of the next four years, Rob watched Philbrick's unerring ability to spot valuable opportunities and make huge profits on art trades, buying works at one price and soon selling them at a much higher one. Rob's key responsibility to ███ was to keep Philbrick in harness, generating miraculous profits.

For Rob, the path to his crime began with the best of intentions. He had always been driven, adventurous and willing to take risks, and had always wanted to start his own company. Soon after he started work for ███ he realized his core skill – identifying the strategies that would make a business sing – was sorely lacking in the world of art dealing. Witnessing Philbrick's rare talent, Rob soon began to imagine building a business with him, where Rob used his business acumen to make the most of Philbrick's eye for art.

Rob initially saw a clear path to this goal within his role in a separate joint art trading venture that ███ and Philbrick formed together. But they both struggled with the limitations placed on them by their partnership, and in time the relationship broke down to the point where Rob faced a choice: give up his goal of forming a business with Philbrick, or leave ███ and pursue it.

When Rob opted for the latter and began working for Philbrick, he had no idea Philbrick was engaged in fraud. He only knew what Philbrick showed everyone else, from ███ to the many other art world players who were eager to cash in on Philbrick's exceptional talent. Rob thought his first day working for Philbrick would be a major step toward achieving what had, by that point, become a long-held dream.

As Your Honor already knows, it all went spectacularly wrong. Philbrick was engaged in a fraud and, before long, Rob was helping him commit it. Rob pitched Philbrick on hiring him as a consultant to take over the nuts and bolts of Philbrick's business, saying his work would free Philbrick up to focus on what he did best. But when Rob got inside Philbrick's business, he found chaos – patchy financial records that did not always match with what Philbrick said and a serious cash flow problem. Ever the problem solver, Rob dug in and tried to do his job – helping Philbrick's business – but in time, with small steps at first and then larger ones, Rob became

Philbrick's fraud's back office: repeating Philbrick's lies, forwarding along doctored documents, helping Philbrick strategize about who to pay what and when, all in order to keep the fraud from collapsing.

Rob committed the crime. He pled guilty because he is guilty.

But even in his commission of the crime, Rob's engagement was definitionally different from Philbrick's. Rob did not view himself as having joined a fraud. That was too big a leap of mind after betting not only his career on Philbrick, but also his life savings on Philbrick's trades (something he did years before quitting ███████). A determined business consultant with a difficult task at hand, Rob remained laser-focused on saving Philbrick's "business."

He did this in ways that support his guilt, but also in ways that sharply mitigate his moral culpability. Throughout, Rob worked to fix the problem – hoping to pay off Philbrick's debts and square the books. He used sale proceeds to do this, squandering none. He never put victims' money into his own pocket. Philbrick had hired him at a monthly rate matching Rob's prior salary for a guarantee of at least half his time. Rob received his first month's pay and never saw another penny. He ended up working for Philbrick for $250 a week over 20 months.

Rob spent no money on himself, lived modestly with his wife (██████████████ ████████████████████), and two young daughters. He bicycled to work and drove to camping vacations in a second-hand economy car, wearing sweaters knit by his mother.

Rob committed the crime, but he did not seek it out or profit from it. Displaying many of the traits that would have made him so valuable had he joined a business struggling for honest reasons, he applied his never-give-up mentality, dug in, tried to fix things, and took far, far too long to leave.

But eventually he did. After 20 months, Rob finally lost faith in Philbrick. He had long believed that Philbrick could save the business by doing what Rob had witnessed him do continuously for more than four years and saw records of for years prior – pull off the kind of spectacular deal that would solve their problems and square the books. Philbrick had no doubt it would happen, he remained sunny and breezily confident throughout. He told Rob to stop worrying, that the market was interested in their artists. A great deal was always in sight. But

3

after 20 months with Philbrick, out of faith and money too, Rob needed to move on and support his family, so he left.

He did not do so cleanly – when he tried to cut all ties, Philbrick threatened to take any losses out on the one investor Rob had met and felt most responsible for – but his involvement became minimal. He knew nothing about what Philbrick did during the fraud's final year, nothing about Philbrick's flight until he went missing, and played no part in Philbrick's looting or wasting of the fraud's assets.

Rob Newland is guilty, but his sins are a far cry from Inigo Philbrick's. The government agrees Rob deserves a lesser sentence in recognition of his role, and as explained more fully below, Rob's sentence should be determined in relation to the sentence Philbrick will actually serve – 48 months – not the 84 months to which he was sentenced. (This is because, as a non-U.S. citizen, Rob cannot earn a similarly reduced sentence because the key Bureau of Prison programs Philbrick, an American, used to obtain his reductions are unavailable to Rob.)

Rob is not only distinguished from Philbrick by their roles in the offense, but also by who Rob is and the life he has led. As detailed in the 96 letters of support, Rob was universally known for his generous, thoughtful, energetic and enthusiastic dedication to his family and community. His selfless devotion to his wife, children and wider family are, as the Court will soon read, a testament to his humanity.

Yet this is not even what is most extraordinary about Rob. Many give their absolute best to their families, but Rob offers the same for his community. For the kids, he is the go-to dad for fun, from petitioning the local authorities to create a space for them to play, to leading madcap games of his own devising that the children anticipate with delight each week. He is also the adult who is always available to help, whether ensuring an autistic neighbor is included in the fun and games, or tutoring others' children in academic straits, or even stepping up as the stand-in dad where a father is absent.

For the adults in his orbit, he is the model neighbor, colleague and friend they most hope to be more like; numerous letter writers make this exact point. He is the person who always has the time to offer real attention, help, and friendship – from advising local businesses on how to survive and thrive, to digging into how to get a new job or promotion, to brainstorming about how

to best raise a child with a learning disability, or teach a fearful son to ride a bike, or develop a new confidence in math.  Through his constant and accumulated acts of generosity and kindness, Rob not only stitched his community together, but helped form it – creating a new and better one than he found, something many of the letter writers note, and one describes movingly.  *See infra* pp. 23-24.

The depth and breadth of Rob's personal history and characteristics take him as far outside the heartland for fraud defendants as his unwittingly joining someone else's serious fraud, not seeking to profit from it, and ending up paying nearly $400,000 in lost earnings to commit it.



Rob's story is the stuff of classical tragedy, but at human scale, as so many of the traits that make him so special – his energy, curiosity, drive, vision, adventurousness, doggedness and willingness to try and fix someone else's problem – conspired against him when he unwittingly

signed up to work for a fraud.  His reaction to what he discovered, together with his own self-admitted stupidity, denial and – most of all – weakness, fear, and shame (these alone are where Rob's focus rests), form the backbone of the answer to Your Honor's question.

███████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

### FACTS

**A.      Rob's Personal History and Characteristics**

**1.      Wales**

Rob grew up in a small, rural community near the town of Cardigan in coastal Wales.  His father was an engineer for the Royal Navy, designing ships; his mother retired from midwifery to take care of her children upon the birth of Rob's eldest brother, James.  Rob was the third of the four boys; ████████████████████████████████████████████

The family was extraordinarily close knit, never missing dinner together throughout Rob's childhood.  His mother believed a "stable loving background does not just happen, but has to be worked for," and her work bore fruit – a lesson not lost on Rob who, among other things, woke up earlier than necessary so that he could spend time talking with his father before he headed off for work.  Cynthia Newland Ltr., Ex. B.3, at 3 (hereinafter, C. Newland (mother), Ex. B.3); Oliver Forrest Ltr., Ex. B.64, at 2 (childhood friend).

Rob was an affectionate child, eager to please his parents – his siblings teased that he was their mother's favorite due to his constant help around the house, chopping firewood, and even serving as an assistant when the family moved house – but he was far from a mama's boy.  C. Newland (mother), Ex. B.3, at 1-2; Ben Newland Ltr., Ex. B.2, at 1 (hereinafter, B. Newland

(brother), Ex. B.2).  His mother remembers that, "[e]arly on he showed either great stubbornness or endurance beyond the norm."  C. Newland (mother), Ex. B.3, at 1.  His father notes that, "he was more interested in adventure (risk) and sport and was very competitive" compared to his brothers.  Nick Newland Ltr., Ex. B.5, at 2 (hereinafter, N. Newland (father), Ex. B.5).  As a little boy, Rob's appetite for risk and adventure was made plain via the occasional broken collarbone from an errant bicycle jump or the dirt from taking a dare to crawl through the 20-foot tunnel under the family's driveway.  C. Newland (mother), Ex. B.3, at 2.  As he grew older, he channeled it and his extraordinary stamina (or stubbornness) into rugby, rock climbing, rowing and mountaineering with the Royal Air Force local cadet (clambering up and down "the exciting Crib Goch route" of Snowden, Wales's highest peak).  N. Newland (father), Ex. B.5, at 2.

Rob was also notably generous as a boy.  In their letters, his family recount a number of stories relating the point, from giving his saved allowance to James ████████████ ████████████████████  to throwing himself into befriending two much younger Russian children the family took in following the Chernobyl accident, ████████████ ████████████████████████████████████████ ████████████████████  Matthew Newland Ltr., Ex. B.4, at 1 (hereinafter, M. Newland (brother), Ex. B.4); B. Newland (brother), Ex. B.2, at 2; James Newland Ltr., Ex. B.12, at 1 (hereinafter, J. Newland (brother), Ex. B.12); N. Newland (father), Ex. B.5, at 2; C. Newland (mother), Ex. B.3, at 2.  He also looked out for his family and friends – keeping an eye on his little brother, coaching his friends through difficult times, and captaining his rowing team via "his unique mix of drive, belief and compassion."  James Coughlan Ltr., Ex. B.84, at 1.

Rob was also dutiful, not only to his family and friends, but to his small, close knit town.  He served (reluctantly) as a choir boy and played the trumpet every year for the town's

Remembrance Day parade for World War I and World War II veterans.  C. Newland (mother), Ex. B.3, at 3 ("Rob hated it but stuck to it as a duty and the house echoed with his practice.").  As he got older, he was the "reliable friend making sure everyone got home safely [in taxis] at the end of the evening," and "always the one to walk away from any mischief that boys would get up to . . . [he would] inevitably be the peacemaker, the one with the level and fair outlook on any situation that arose."  Anja Dunk Ltr., Ex. 48, at 1; Keith Wills Ltr., Ex. B.47, at 2.  He was "good fun, but at the same time sensible and dependable."  Anja Dunk Ltr., Ex. 48, at 1.

### 2.  University, Business School & Early Career

Rob earned a place studying economics at the London School of Economics.  Several of his classmates became lifelong friends, submitting letters to Your Honor.  Most focus on the time since, but one describes the transition from school to university:

> Rob grew up in a small town in Wales, where everybody knew each other, which helped turn him into a very trusting person who always sees the best in others. When I first met him when we both arrived in London to go to university, he was wide-eyed, discovering a diverse world he had no idea was out there. This has had wonderful implications, as Rob has always been very open, friendly and caring when meeting any of my other friends or wider family and has a true welcoming openness to him, sometimes bordering on a child-like naïveté.[1]

Sean Joyce Ltr., Ex. B.8, at 2.

After three years studying in London, Rob headed to HEC Paris, one of the world's top business schools in pursuit of an MBA.  He bonded with the other foreign students.  They describe

---

[1] Rob's brother Ben also notes Rob's unusual willingness to extend "deep trust" in people:

> My parents still have the "17th Century Nun's Prayer" hanging in the downstairs toilet room, and the line "give me the ability to see the good things in unexpected places and talents in unexpected people" rings very true of Rob, who's instinct is to assume the best of someone.

B. Newland (brother), Ex. B.2, at 3-4.

him as in "constant search for complex situations and answering them," "extremely hard working and goal oriented," and clearly "someone eager to learn, discover and challenge himself."  Harald Meinders Ltr., Ex. B.66, at 1; Gisle Gluck Ltr., Ex.B.41, at 2.  Rob was "a leading force" in the subjects that interested him, driven by his "curiousness, desire to understand how things work, and not least a strong drive to create something of value to society."  William Germain Ltr., Ex. B.19, at 1.  He also possessed an extraordinary work ethic that showed itself both on study projects and solving problems of a different kind: pursuing his passion for rock climbing.  *Id.*

Indeed, for six months after Rob earned his MBA, it was the problems of the rock face, not the balance sheet, that consumed him:

> We were both very determined and motivated rock climbers during this time. We lived a very simple lifestyle, eating only basic food with no alcohol, simply climbing, as much as we could, and trying to push the boundaries of what we were able to achieve on rock. We spent almost no money (only food plus some fuel when we moved between different rock climbing locations) and slept in an old Land Rover for accommodation.

Oliver Forrest Ltr., Ex. B.64, at 1.

Following this hiatus, Rob began his career in business, moving to Birmingham for two years' executive management training with Mitchells & Butlers, a British restaurant and pub company, before earning a spot managing a chain of its London pubs.  Two years later, Rob secured a position in McKinsey's Oslo office.  He loved the problem solving of management consulting and relished the adventure of living in Norway.  He worked hard, traveling constantly, and "played" even harder, completing an Iron Man triathlon (2.4-mile swim; 112-mile bike ride; 26.2-mile run) and Norway's Birkebeiner, a 34-mile cross-country ski race, despite being a sufficiently inexperienced skier that his colleagues posted a sign afterwards saying, "if he can do it, anyone can."  N. Newland (father), Ex. B.5, at 2.

9

During his time at McKinsey, Rob returned to the UK as often as possible to visit █████ his future wife, whom he had met while in Birmingham.  In 2009, two years into McKinsey, and just 30, Rob began looking for a way back to the UK and █████  He soon secured a position as a Strategy Manager, heading a three-person internal consulting team for the international auction house Christie's London office.  His work was extremely similar to McKinsey, but instead of solving problems across various companies and traveling constantly, he was only solving problems inside Christie's.  While not exposing him to the art, artists, auctions or bidders that drive Christie's business, the position required him to analyze a wide range of business questions, such as whether, where and how much to cut costs across the company's international offices, what strategic plans the various diversified businesses should pursue, and whether to open a location in China.  While the work was still intense and required travel, it did not carry anything like the same workload (or possible future remuneration) as McKinsey.  But Rob was very happy to take a step away from the fast lane to focus on █████ and starting a family.  They were married within months of his return, and █████ gave birth to their daughter, █████ in 2010.

Two years later, with a two-year-old at home and a newborn on the way, Rob received a call from a headhunter pitching a job as the commercial director for a top London gallery called █████.  Seeking to take another step toward the kind of work-life balance that would pair well with raising children the way he wanted to, and thinking that learning about the gallery world would be interesting, Rob took the job.  As detailed below in addressing the nature and circumstances of the offense, he soon met Inigo Philbrick, who was also working for the gallery's owner, and the story that led to the crime of conviction began.

### 3. Family & Community

Following his return to the UK and marriage to █████ Rob built the life that defines him. In the months leading up to █████ birth, he and █████ bought a home in █████ a quiet, late-

gentrifying, family-oriented neighborhood in West London.  From then until now, his life has revolved around family and community first, and work second.

### a.  Family

In 2013, ███████ and Rob's second daughter, █████ was born and Rob threw himself further into parenting.  He happily sacrificed to create the space necessary for the kind of family he came from and wanted, quitting rock climbing (too high risk; too time consuming) and going to bed "earlier than the other adults" in order to get his cycling in at "unbelievably unsociable times so that he does not miss any time with his girls."  David Hall Ltr., Ex. B.42, at 2; Dinah Hawkyard Ltr., Ex. B.39, at 1.

Rob and ██████ chose not to send their girls to private schools, "[p]artly because we were both educated in state schools and believe there is much to be learned about the world within that environment, and also so we would not be overly stretched in our finances and could live comfortably on what we earned." ████████████████ Ex. B.1, at 2 (hereinafter, ████████████ (wife), Ex. B.1).  She explains further:

> We have always had a very similar financial outlook, which is hugely helpful within our relationship. We are both hard-working and driven, and want to succeed through that path. Neither of us expected to be handed anything on a plate. We both also know that more money does not bring more happiness. Rob has worked with very financially, successful, unhappy people. I could have taken on additional lucrative, private work ███████████,[2] as many of my colleagues do, but we decided that what we were earning was enough. What was more important to us was the time with the family.

*Id*.

Rob and ██████ ran the household as equals, with Rob jumping into every aspect of raising children.  "To say Rob is 'hands on' does not do him justice: he is comprehensively and

---

[2] ████████████████████████████████████████████████████████████████

energetically engaged in all aspects of family life," including all aspects of making the household

work: cooking, cleaning, school drop offs and pick up."  Alice Muhlebach Ltr., Ex. B.13, at 1.

> What I remember most about Robert during those early years is not
> just how often I would spot him at the school gates; it was that after
> saying goodbye to his daughter (at which point most of the other
> parents would inevitably rush off to start their busy day), Robert
> waited behind to see ██████ climbing the stairs to her classroom so
> that he could wave one final goodbye to her through the window.

Edward Sunderland Ltr., Ex. B.11, at 1.

Rob's exceptionally thoughtful, present, constant and loving care for his daughters forms

one of the two subjects nearly every one of the 96 letter writers dwell upon.

The other is play.  Many letters note Rob's ability to "make[] fun happen."  C. Newland

(mother), Ex. B.3, at 3.  Inside the house, where █████ perhaps somewhat plaintively, notes Rob,

"insist[s] that the toys be able to take over the house . . . [h]e always tells me we can have a tidy

house when they have grown up and left home" – that means board games, storytelling,[3] sliding

down the stairs on mattresses, cooking, learning instruments, doing puzzles and – most importantly

(by far) spending time at the Lego table Rob custom built.  ████████ (wife), Ex. B.1 at 1.  Friend

and neighbor Nicholas Gillet describes it best:

> Visiting Rob in his home as I have many times, the first thing that
> strikes you is the Lego. Not ready-made kits, but volumes of the
> stuff, some made into elegant towers, some into crazy vehicles,
> some into city scenes, but all built alongside his girls: ████████
> ████ The special Lego building table in his kitchen, which, partly
> overflows to a nearby sideboard, is a hotbed of invention, and
> reinvention that changes with every visit. . . .
>
> Although a great many parents encourage their children's curiosity
> and design ability by buying them Lego, few in my experience spend
> the tracts of quality time that Rob does, helping, sorting, offering
> design pointers, and facilitating his daughters' burgeoning love of

---

[3] "He made up stories to tell them, often featuring barely disguised members of the family, giving them rather risqué
traits, which would have the girls fits of giggles, but also show them that they too could make up stories."  Janet
Jelbert Ltr., Ex. B.57, at 2.

> engineering. It's inspiring to see, and all the more so when both girls
> clearly adore him and the projects they built together.

Nicholas Gillet Ltr., Ex. B.9, at 1.

Outside the house, Rob makes life fun and adventurous, too, whether at home in ███ –

cycling everywhere, climbing at the gym, doing jiu jitsu with ███ running in the weekly 2k, to

be followed by a game of "Cooking Pot" (more later) – or when camping or visiting family in

Wales where the outdoors takes centerstage, including water fights, paddle boarding, hiking,

canoeing, tree climbing, obstacle courses, timed races in wheelbarrows, or the various made-up

games that earned names from Shark Attack to Polar Bears and Penguins to the "be in water" rule.

Alice Muhlebach Ltr., Ex. B.13, at 2 ("the three of them [Rob, ███████ ] had to 'be in water'

at some point on *every* day of the holiday – some days that involved swimming at the beach, but

on others it could involve a creek or any other water body that presented itself, . . . if no

opportunities readily presented themselves, Rob actively sought them out.").

Amidst the fun, "academic development is not overlooked: on my last stay with Rob and

his family, his daughters were regularly challenged before school with long addition and

subtraction of 10 digit numbers."  Richard Jelbert Ltr., Ex. B.62, at 2; *see, e.g.*, Shaun Terry Ltr.,

Ex. B.44, at 1 ("Rob . . . dedicated six months to tutoring ███ n Maths before her regular school

day, even giving up our cycling sessions during that time. ███ benefited immensely from these

pre-breakfast tutorials, and her academic performance has surpassed many of her peers."); B.

Newland (brother), Ex. B.2, at 3 ("I see first-hand the time he puts into helping ███████

with school projects, or improving their painting skills, or explaining historical events, etc.  Rob

and ███ read an impressive amount to their children, instilling a love of books . . . [and my

wife and I] were quite taken by the children's Christmas stockings being stuffed so full with

books.").

13

Rob and ███████ thoughtful, conscientious and fully engaged parenting is covered with the fingerprints of the problem solver previously focused on rock faces and financial analysis. What is most fun about a game? Chasing. Make up chasing games. What's best for girls growing up in an age of screens? Creating buildings from their imaginations. How to develop empathetic children? Instill a love of reading. Why can't a childhood be filled with fun, love and learning? With enough energy, devotion and love – three things Rob Newland has in spades – it can.

If judged by ████████ the investment has paid off. They are:

- "the most kind, thoughtful and fair children I know" (Liisa Chauhan Ltr., Ex. B.28, at 1);

- "well-rounded, kind, thoughtful, creative, funny and courageous" (Bharat Parmar Ltr., Ex. B.16, at 1);

- "sporty, extremely bright, bookworms, have wonderful friendships and love life" (Carmen Prem Ltr., Ex. B.14, at 2);

- "very grateful and kind children, clearly shaped by a very loving environment" (Rosie Dutton Ltr., Ex. B.22, at 1);

- "outgoing, capable, courageous and caring young people" (Guy Billings Ltr., Ex. B.89, at 2);

- "intelligent, eloquent, polite and funny kids" (Harald Meinders Ltr., Ex. B.66, at 2);

- "like him, they are down to earth and genuine people" (Lucy O'Shaughnessy Ltr., Ex. B.27, at 1).

**b.     Wider family**

In addition to ██████████████ Rob's relationships with his parents and siblings and their children also play a major role in defining who he is.

14

Perhaps oddly as the third of four boys, Rob was the Newland sibling who stepped up, "took others under his wing, protected the family and kept the family together then and now."  B. Newland (brother), Ex. B.2, at 1.

Rob assumed responsibility for keeping the family close by organizing family gatherings three or four times a year.  M. Newland (brother), Ex. B.4, at 2; *see, e.g.*, Heike Newland Ltr., Ex. B.20, at 1 (hereinafter, H. Newland (sister-in-law), Ex. B.20) ("He is the one who insists upon family events to get everyone together, such as family holidays, family dinners, and Christmas").

He also took on the burden of serving as the family's financial backstop to support ███ ████████████████████████████████████████████████████████[4]  *E.g.*, Laura Joyce Ltr., Ex. B.10, at 2 ("Rob is very aware ███████████████████████████ ████████████████████████ . . and Rob has placed the responsibility of providing this on his own shoulders"); Sean Joyce Ltr., Ex. B.8, at 2 ("Prior to being married [Rob] always felt the responsibility to put himself in a financial position to provide ██████████████████ ████.").

██████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[4] ████████████████████████████████████████████████████████
████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED].

As to his family's children, when they all get together, "it is no exaggeration to say he is their holiday." M. Newland (brother), Ex. B.4, at 2. "[W]hile everyone else would rather relax . . . Rob is always trying to find interesting things to do," typically outdoor adventures that span from building driftwood tents and searching for crabs at the local foreshore to marching them all up and down Snowden to lengthy games of "shark attack" in the freezing coastal water. H. Newland (sister-in-law), Ex. B.20, at 1. "He seems to have a natural affinity with children that brings out the best in them, and generally stretches them to new capabilities. . . .Whenever he is here with us, we become a magnet for children." N. Newland (father), Ex. B.5, at 2.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Rob's family-first approach to life does not just extend to his nuclear family, brothers and parents. Multiple letter writers discuss his efforts with his sister-in-law's son, an only child with divorced parents, [REDACTED]

[REDACTED] *see also*, Alice Muhlebach Ltr., Ex. B.13, at 2 (noting Rob extends to [REDACTED] "substantially the same care and energy he shows his own daughters"); Richard Jelbert Ltr., Ex. B.62, at 1 ("[Rob] had a significant part to play in helping [REDACTED] to become the wonderful, loving, funny, confident and happy boy that he is.").

Recognizing all the above, Rob's brother Ben says Rob has been an "inspiration to . . . become more helpful and selfless." B. Newland (brother), Ex. B.2, at 3.

c.     **Community**

Rob's commitment to and role in his community is, if anything, even more exceptional. He serves as the "fun dad" to the neighborhood children, inventing games and fostering joy, but also catering his help to the needs of individual children in the neighborhood. For many busy parents, he has not only stitched their children's community together through his time and energy,

but has also forged relationships with neighbors, ranging from a handyman to a bus driver to a local restauranteur to a member of the House of Lords.  Rob generously donates his time – seemingly to everyone in the neighborhood – helping them, often profoundly, with problems that stretch from raising a child with learning disabilities to keeping a business afloat or improving it to getting a job or promotion.  "He is a person who is generous with the most finite and precious resource we have: Time."  Guy Billings Ltr., Ex. B.89, at 3.

     *i*     *Children*

Rob is the "most fun parent" in ████ the "go to dad for fun," and the "children's favourite dad."  Aimee Morgans Ltr., Ex. B.31, at 1; Bharat Parmar Ltr., Ex. B.16, at 1; Dougal Shaw Ltr., Ex. B.43, at 1.  He "is extremely generous" and in possession of "a seemingly endless supply of creative games, often invented on the spot, that captivate and engage the children for hours on end."  Dougal Shaw Ltr., Ex. B.43, at 1; Bharat Parmar Ltr., Ex. B.16, at 1.  First and foremost is Cooking Pot.

> This is a game where Rob and another unlucky parent, such as myself, would guard an area called the "cooking pot", and then chase the group of our children playing around the playground, and carry them back to the "cooking pot" one by one, whilst the ones still free would try to tag the others in the pot to release them. . . . Much to the delight of the kids, and the bemusement of onlooking parents watching two middle-aged adults humiliating themselves, trying to catch the much faster and agile little monsters.

Tej Chauhan Ltr., Ex. B.21, at 2.

Cooking Pot takes place every Saturday after "Park Run", a 2k race at the local park which Rob attends, "*every week*, rain or shine, not just supporting his children on the run, but all those kids who are interested in setting a new 'personal best' or just needing some extra encouragement . . . tirelessly cheer[ing] them on, or run[ning] right next to them, coaxing them to run just a little bit faster using his running experience."  *Id.*

Numerous letter writers note Rob's active engagement encouraging other people's children in "sport":

- "He will be the first Dad to get involved in throwing a ball around for my boys." Dinah Hawkyard Ltr., Ex. B.39, at 1.

- "He has often helped my own daughters improve at rock climbing at our local wall." Dougal Shaw Ltr., Ex. B.43, at 1.

- "He was always very generous with his time and would take other kids out on the canoe as well." Catherine Glover Ltr., Ex. B.51, at 2.

- "[He] has also been very good with my children. He likes to play with them, always encourages them to do and be their best and is like an uncle to them." Carmen Prem Ltr., Ex. B.14, at 1.

- "Rob has developed a reputation as the go-to person for helping reticent children learn how to bicycle . . . [helping] mine and many others with his trademark 'pretend you are holding the saddle, run with them, and let go without them realizing it' – but somehow managing to enhance all of us parents' enjoyment of this rite of passage, by coaching us to coach them with him." Zoe McDougall Ltr., Ex. B.17, at 1.

His impact is not limited to sports. Rob organized "Play Streets," a "monthly event . . . where the road is closed . . . and children can play outside." Lucy O'Shaughnessy Ltr., Ex. B.27, at 1. "[He] applied to the local government for a permit to run the event, such that the road could be closed and cordoned off, and the children could play freely for a whole afternoon." Adrian Gans Ltr., Ex. B.33, at 1. "At the appointed hour, . . . children begin to emerge from their houses with bikes, scooters, skipping ropes and footballs. Younger kids draw on the street with chalk and play tag and hopscotch. Their parents chat and laugh and gather in groups to enjoy themselves. . . There is something idyllic about it all." Simon Richardson Ltr., Ex. B.45, at 2.

In addition to fun, sports and Play Streets, the letters are also rife with stories of Rob taking time out for other people's children:



- 

  Christopher Walsh Ltr., Ex. B.38, at 1 (local restaurant owner).

- Another example of Robert engaging and thinking about children and family is a time with our eight-year-old son. We were at an art opening, which can be boring for younger children. Robert had a business card which he showed to our son. He and my son then created a scenario together where Robert wrote "special" numbers on the card which would enable our son to gain access behind a secret door. They carried on this conversation over many months and years and my now 15-year-old son still has the business card today.

  Tom Wolseley Ltr., Ex. B.63, at 1.

*ii    Adults*

Rob's investment in his community is not limited to its children.  "For many, he is the first, and sometimes only person turned to [for] professional and personal problems.  He doesn't just give an opinion, he goes out of his way to help."  David Hall Ltr., Ex. B.42, at 2.  Notable examples include:

- Advice to a local restaurant

  Rob was one of the first people, as we started to emerge from the first lockdown, that contacted me to see how we were doing with real concern for our future.  What then proceeded was hours and hours of support and energy from Rob seeing him working with me to help identify how we could best cope and implement strategies that we could put in place to somehow try and save my family business.  So not only was his unpaid time and effort severely

welcome but it was valuable and I would say an important factor in our survival.

Christopher Walsh Ltr., Ex. B.38, at 2.

- Advice to a local plumbing company

I run a successful local plumbing company and 2 years ago Rob helped me to structure an incentive system to help me reward and maintain my senior staff.  I implemented this and it's been very successful.  He helped me and spent many evenings working on it without asking for a penny in return.

David Halpin Ltr., Ex. B.53, at 1.

- Advice to a local gallery

I established my gallery space . . . towards the end of 2019. . . . Robert's enthusiasm about having the gallery as a new facet of the community was very encouraging. . . . In many ways, Robert became a mentor to me. Although I wasn't a newcomer to the art world, I was still finding my feet as a permanent gallery owner. Having Robert there to guide me answer my queries, and continuously encourage me was a godsend.

Jewel Goodby Ltr., Ex. B.59, at 1.

- Advice to a recent graduate

During the beginning of 2016, I was applying for my masters degree in physiotherapy. I was offered an interview at Saint George's, University of London, which involves six rounds of role-play, practical task, clinical question, problem-solving tasks and personal questioning. Interviews have always been of things I have never been successful in and came with huge amounts of dread and anxiety.

Rob offered to help me and kindly sat down with me for a generous number of hours, and we practiced interviewing and interviewing skills. Rob put a lot of effort into this, and was extremely patient with me, reassuring, and provided lots of constructive advice. I was successful in this interview, and they offered me a place on a course which had 250 applicants, and only 20 places. . . . Those hours gave me the courage and confidence in a form that I never thought I had.

Rosie Dutton Ltr., Ex. B.22, at 1 (former babysitter).

21

Writ large, Rob supports the community by modelling himself as an exemplary neighbor. From "extending warm invitations to barbecues . . . even at the slightest hint of sunshine," to "helping out at the local church soup kitchen . . . [taking] time to talk to them and often stay[ing] long after his shift."  Bharat Parmar Ltr., Ex. B.16, at 1; David Halpin Ltr., Ex. B.53 at 1.  One neighbor eloquently sums up the full scope of the impact:

> In the years before the Newlands moved into the street, ███████ ██████ had been an averagely attractive, averagely quiet, corner of suburban West London. People were polite and friendly enough, but there was not a great deal of interaction between neighbours and very little to be had in the way of fun. That all changed with the arrival of Robert. Within a few weeks of moving in he had met and befriended almost everyone on the street, stopping to chat with everyone he bumped into, offering to help move furniture or the ferry children. . . .
>
> For Robert, being open, friendly and caring is completely natural; he can't help doing what he can to make life better— more fun, essentially — for everyone. . . . His behaviour encouraged his neighbours to talk to each other, to help out when help was needed, to share thoughts and ideas and to work together to get things done. Without me realizing it, he had made me contemplate ways that I could make a small difference to life on ███████████. I started to look in on my elderly neighbour. I did a weekly litter pick, and I too began to find time to stop and talk and care. His behavior was contagious – it became entirely normal on ███████████ for neighbors to exchange a friendly word, to offer a helping hand, or to be on hand with a badly-needed cup of coffee, or a consoling glass of wine.

Simon Richardson Ltr., Ex. B.45, at 2.

### d.    Rob's Make Up

The letters in support of Rob discuss many of the personal traits that have led to his impact, most frequently detailing his generosity, warm-heartedness and tirelessness, traits amply shown in the above.  They also include other observations relevant to Your Honor's decision about who Rob is and what makes him tick.

To begin, Rob's family and friends from childhood to university and business school to young adulthood and middle age, all agree that Rob has never been materialistic or driven by money. *E.g.*, Laura Joyce Ltr., Ex. B.10, at 2 (friend of 20 years) ("Rob rarely buys clothes and is often found wearing a jumper knitted by his mom. ███████ buys her, ████████████ clothes mainly from thrift shops, and they make full use of hand-me-downs. Rob and ██████ own one car — a Skoda — that they have had for many years and often holiday at their parents' homes . . . ."); Frances Ward Carpenter Ltr., Ex. B.40, at 2 ("Rob and ████████ are genuine, unpretentious people who have no interest in expensive cars or fancy holidays. They enjoy camping trips with their kids and spending time with their many close friends."); N. Newland (father), Ex. B.5, at 3 ("He's not in the least avaricious . . . [h]e's never changed jobs for the money, always for the new challenges they presented."); Keith Wills Ltr., Ex. B.47, at 1-2 ("Never has Rob been the person that must have the latest gadget, the coolest car, the best clothes, none of that matters to Rob. Family, above all else matters to Rob, more than I can convey.").

Many also note Rob's "plucky, risk-taking and competitive streak." Dougal Shaw Ltr., Ex. B.43, at 1. This observation comes loudest from his cycling friends who note that despite not being "the most talented athlete," he is "competitive to his core." David Hall Ltr., Ex. B.42, at 2; *see also*, Jon Osborne Ltr., Ex. B.7, at 1 ("he has to win everything!"); David Hall Ltr., Ex. B.42, at 2 ("what he lacks in talent . . . he more than makes up with effort."). This trait is best captured by a picture accompanying one of the cyclist's letters, showing Rob midway through a lockdown training competition with "a heartrate well in excess of the rest of us," with Rob "going deeper into the red than we would dare." David Hall Ltr., Ex. B.42, at 2-3.

Closely paired to his competitiveness, perhaps, is Rob's willingness to commit and go all in. This clearly comes across in the cycling story, but it is also reflected in the quantity as well as

quality of his investment in his family and community. *See* Nicholas Gillet Ltr., Ex. B.9, at 2 ("He's . . . someone who appears at ease giving 100% to every single thing he does. In many ways, I aspire to be more like him."); Bharat Parmar Ltr., Ex. B.16, at 1 ("What strikes me most about Rob is his insatiable curiosity and boundless enthusiasm. When he dedicates himself to pursue an activity, he does it wholeheartedly."); Gisle Gluck Ltr., Ex.B.41, at 2 ("Rob is extremely hard working and goal oriented. He will always have a clear picture of what he wants to accomplish and work relentlessly on getting there.").

Rob's make up – generous, loving, responsible, committed, optimistic, goal oriented, competitive, curious, relentless, hard working – served him exceptionally well over the course of his life – both personally and professionally. Many of them turned against him when he began consulting for Inigo Philbrick in 2017.

### e.     The Last Three Years

Since Philbrick's flight and arrest, the civil suits, and Rob's arrest, Rob and his family have been in a prolonged state of crisis. ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ Rob worked until late 2022, first serving as the business director of a prominent London gallery, ████████████, and after losing that job following Philbrick's arrest, for an experiential art venture called ████████ based in Miami that hired him with knowledge of the case but terminated him following his plea (████████ head, a colleague, and a member of Rob's team wrote glowing letters about Rob's significant contributions there despite his prior termination following his guilty plea). *See* Max Fishko Ltr., Ex. B.25; Jorge Mora Ltr., Ex. B.71; Carlotta Dochao Naveir Ltr., Ex. B.15. Since Rob's guilty plea, he has cared for the children and house full time, with ████ expanding her

shifts ███████████ to help recoup Rob's lost earnings.  The family's savings have also been decimated, with ███████ using her life savings to buy out Rob's share of their home,[5] and Rob using that money as well as his own life savings to pay for counsel.  *See* ███████████ wife), Ex. B.1, at 6 ("We were always careful savers, but this has been almost entirely wiped out by this process.").

The financial strain on the family has paled in comparison to the personal toll. ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████

Rob, of course, knowing he has ruined what he has spent his life building, is destroyed. *See* B. Newland (brother), Ex. B.2, at 4 ("I had never seen him cry before this all started, but over

---

[5] This process was overseen by a UK solicitor who ensured transfers took place at market values and in conformity with UK law.

the last year he has frequently rung me up in tears, full of shame, and worry about how his ███

████████████████████████████████████████████████████ . . .

with me to support ████ through it all, and above all complete regret for all his involvement

with Inigo, like one who has made a mistake that seems stupidly obvious in hindsight."). ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

    Amid all the hardship he has caused, Rob makes no excuses, accepting full responsibility

for his actions.  He relates in his letter to the Court that the hardest thing he has ever had to do was

explain to his daughters that he had "actually done what the Americans were accusing me of."

Robert Newland Ltr., Ex. A, at 14; *see also*, ████████ wife), Ex. B.1, at 4 █████████

████████████████████████████████████████████████████

██████████ Rob states that, "the shame of explaining it to others has paled in comparison," but

many letter writers noted his refusal to make excuses in that context as well.  *Id.*; *see, e.g.*, Max

Fishko Ltr., Ex. B.25, at 1 ("Of the many moments where Rob has impressed me over the years,

one that stands out is how he has handled this very matter. In a murky art world, where one could

easily blame circumstance or context to peers, Rob has owned his choices. He sees his mistakes

26

clearly and confronts them with uncommon honesty and candor. . . . He has faced up to the truth, difficult as it is, unwaveringly."); Edward Sunderland Ltr., Ex. B.11, at 1 ("I was struck by his refusal to explain away his actions, or wriggle out of any personal responsibility.); Zoe McDougall Ltr., Ex. B.17, at 2 ("He expresses . . . responsibility for his actions.").[6]

Understanding the significant additional burden his crime will cause his family during any period of incarceration, with ███████ increasing her shifts to pay for additional needed childcare in his absence, and the huge emotional toll his absence – with him incarcerated in the U.S. where they cannot visit – will take on her and the girls' mental health and futures, Rob has placed his energy on his sole goal: doing whatever he can to protect and help ██████ and his girls given what he did to them, what it has meant for them, and what it will mean for them.  This means being with them as much as he can while he can, owning up to what he did and taking every step he can to handle the parts of this process he can control as well as he can, and turning his mind to how he can rebuild and begin to make amends.

### B.   The Nature and Circumstances of the Offense[7]

### 1.   Starting Out in the Gallery World and Meeting Philbrick

Rob Newland did not set out to commit fraud.

In 2012, a headhunter called Rob about leading the commercial operations of ███████, a top London art gallery.  It was a welcome step further off the fast track ██████ was soon to arrive),

---

[6] This resounds loudly with the undersigned.  In just under 10 years as a federal prosecutor in the Eastern District of New York and just over 10 more as a defense attorney, I have never seen a person more fully own their mistake and more unwilling to look for an excuse.

[7] As noted, Rob submitted a letter to the Court answering in extraordinary detail the question Your Honor asked following his guilty plea:  why did he commit the crime.  His answer is – exponentially – the best explanation of the nature and circumstances of the offense. ████████████████████████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

but still a high-paying job with lots of opportunity.  Rob also thought that learning about the art side of the art world – the artists, their work, and the galleries that bought and sold it – would be interesting.

He arrived and immediately spotted much to do – the gallery world existed seemingly untouched by even the most basic principles Rob had learned in business school.  But there was one standout performer.  The gallery's owner, ████████, bought and sold artwork out of his own side business and he asked Rob to help him there, too.  Reviewing its books, Rob saw that the company's lone employee, a young art trader named Inigo Philbrick, had been generating 10 times the profits of ████████ entire 150-person operation.

Among Rob's initial tasks, ██████ asked him to keep Philbrick in his current role.  He was an enormous talent, producing incredible returns, and ██████ wanted to make sure they continued.  Rob met and liked the confident young trader with an unerring eye for the art market, and over his first few months, working with a ████████ internal team and outside counsel, helped determine the best path forward.  They proposed ██████ keep Philbrick in "golden handcuffs" by setting up a jointly held company owned fifty-fifty by ██████ and Philbrick.  Robert Newland Ltr., Ex. A, at 2.  The venture's joint structure was reasonably complex because it needed to hide ████████ involvement, including from many of ████████ most senior executives – his participation in his own an art trading company had been causing problems with the artists ████████ success depended on.  The new venture's business terms, captured in a 30-page agreement, were extensive, but in essence the arrangement was straightforward: they agreed that ██████ would provide the lion's share of the financing, Philbrick would do the trading, and the profits would be split, with the majority reinvested to expand the operation over time.

The last part caught Rob's attention.  From his first review of ███████ books, he had been struck by Philbrick's eye-popping track record – his return on investment was extraordinary in any business – and in meeting with Philbrick to try to determine what he wanted from the relationship with ██████ (and thereby find the best path forward), he was impressed with Philbrick's focus on reinvesting to grow the business and scale up his trading rather than dickering about his percentage of the profits.  Rob had been able to improve ██████████ sales team's performance significantly in just a few months, but Philbrick did not work at ████████████  The joint venture, misleadingly called ██████████ to disguise ██████████ ownership interest, provided Rob with a nominal administrative role, but he saw the company's enormous potential, and he believed that if he could help ██████ and Philbrick reach it, there could be a far more significant role for him managing its sales team – an exciting proposition.

Over the following year, the joint venture performed well, but as Rob details in his letter, neither Philbrick nor ██████ would stick to the terms of their agreement.  This created friction, and Rob continued to try and fix things – to find a way forward, resolve the issues between ████████ and Philbrick, and grow the business to capture Philbrick's value at scale.  He worked hard at it because ██████ told him to, and because he believed in the business's future and that it could be an exciting part of his future, too.[8]

A few months after the joint venture formed, with ████████ knowledge and permission, Philbrick formed his own, separate, art trading company.  The joint venture's terms were updated to define exactly what Philbrick was allowed to do and not do outside of it – provisions Philbrick quickly violated, pointing to ██████████ own breaches as justification.  But still the partnership

---

[8] This included giving Rob 1% of company profits and the opportunity to invest in the deals, something he first took advantage of in 2014 when he placed approximately £80,000 he earned from the sale of his old apartment in Birmingham into a trade.

continued, as did Rob's hopes for it.  He was, however, becoming increasingly concerned the center might not hold.  Philbrick wanted more financing than ████ would provide, and had already begun to search elsewhere, finding his own, separate sources of funding for a number of deals.  He was doing the majority of them within the joint venture per its terms, but Philbrick was the talent, and since Rob had seen him and ████ serially disregard their agreement's terms, he foresaw the day where Philbrick would fully strike out on his own – the very thing he had been trying to prevent.

It was in this posture that, in 2015, ████████████, a German company seeking to finance art trades, approached ████ with the idea of investing in ████ works together. When he turned them away, they sought out Philbrick.  He turned them away, too, telling Rob they were "overly money focused."  Robert Newland Ltr., Ex. A, at 5.  When Rob heard this, he saw a chance not only to help rescue the foundering joint venture, but to prove his worth in what he still hoped could be a vibrant future business.  While the sailing had not been smooth thus far, the trades continued to produce extraordinary returns.  Philbrick's primary complaint was the lack of funding; his primary desire, to buy more – and more expensive – art without limitations on his freedom.  Rob had met ████ when they pitched ████ and he explained to Philbrick that while ████ did not want to take a lot of risk, he believed they could structure deals in a way that would suit them both.  He suggested giving ████ the first 10% of any profits on a trade and in exchange, they would invest 70% up front and provide the joint venture with a disproportionate share of any profits over 10% – an arrangement that would lead to huge returns on minimal investments if Philbrick continued to trade the way Rob had first seen in ████ books, and had now been witnessing for more than two-and-a-half years.

Philbrick so liked Rob's plan that he offered Rob the chance to invest his own money in any ███ deals that came about because of it, a prospect that excited Rob given what he had seen. When Philbrick then placed the first ███ trade within his own company, not the joint venture, it meant that if Rob wanted to invest, he would have to follow suit.  In his letter, Rob describes this moment as "a major fork in the road where I should have said no."  Robert Newland Ltr., Ex. A, at 6.  To understand why he did not, it is helpful to take a step back.

### 2.    Rob and Philbrick's Relationship

Rob's business intelligence, problem solving ability, work ethic and likability brought immediate success at ██████ but he was a fish out of water.  ███████████ ██████ owner, billionaire clients, and salespeople pulled from England's oldest families did not come from rural Wales, did not know anyone from rural Wales, and had not, for example, spent six months sleeping in an old Land Rover on the side of a mountain or a decade of nights and weekends poring over spreadsheets detailing the output of complex financial models.

Philbrick, very kindly Rob thought, helped him navigate this issue.  In figuring out how to keep Philbrick in ██████ fold, Rob met with him, quizzing Philbrick in order to understand what he did and what he wanted.  Rob soaked up the answers.  He learned which artists were good and why, why certain works did or would increase or decrease in value, and the counterintuitive rules by which gallery markets operated – e.g., galleries do not sell their most important artists' new work at the highest price possible, but far below it to the most prestigious collector or museum possible.  Rob's curiosity for this fascinating new world was endless; the lessons he learned, extensive and valuable.  They continued for long after the joint venture began, with the two men meeting up for drinks or dinner once or twice a month.  Rob also learned much from ██████ a deeply respected titan of the art world.  But Rob is a numbers person, and the numbers never lie

31

(or so he thought).[9]  He felt incredibly lucky to be getting his art dealing education from the person who, as far as he could tell, was trading the most successfully within it.[10]  Over the course of their conversations, Philbrick also taught Rob the kinds of lessons unavailable at Mitchells & Butlers or McKinsey, or from the operations people he worked with and for at Christie's, "kindly mock[ing]" Rob's taste and explaining the subtleties of what to wear, order, and, more broadly, how to present himself that Rob knew were important coins in this new realm.  Robert Newland Ltr., Ex. A, at 4.

Rob thought Philbrick liked and valued him, too.  Philbrick vented about his frustrations working first for and then with ▐▐▐▐▐, and Rob was a good audience, because he was both eager for information he could use to smooth out their many disagreements, but also because he brought fresh eyes and a different kind of intelligence to the business of buying and selling art.  Philbrick seemed eager to hear how Rob thought the business could be run better, could grow, and their conversations often led to discussions about how they could turn the joint venture into a much larger, world-beating art dealing business and gallery.

Rob's enthusiasm for this future drove his effort to make things work with ▐▐▐  Their financing would offer a chance to scale toward it, and figuring out how to obtain it in a way that worked for everyone offered Rob a perfect opportunity to concretely prove his value.  When

---

[9] It is not clear (to the undersigned, at least) whether Philbrick's amazing performance before and during Rob's time at ▐▐▐▐▐ was completely real or included the same kind of fraud later revealed.

[10] *See, e.g.*, ("Dalya Alberge, *He's sabotaged his entire life for greed': the $86m rise and fall of Inigo Philbrick*, THE GUARDIAN (May 25, 2022), https://www.theguardian.com/artanddesign/2022/may/25/inigo-philbrick-jailed-art-fraud (He was perceived as a "suave American dealer, with a gallery at an exclusive London address, a Midas touch that brought soaring profits in art sales and a socialite girlfriend from Made in Chelsea." "In 2013, he established his own contemporary art gallery, in Mayfair and, after a reported turnover of about $130m in 2017, he opened a branch in Miami, Florida."); Sarah Douglas, *Who Is Inigo Philbrick? Meet the Man Behind One of the Biggest Potential Modern Art Scandals*, ARTnews (Dec. 3, 2019), https://www.artnews.com/art-news/news/inigo-philbrick-dealer-lawsuits-explained-1202670107/2/ ("Inigo Philbrick's colleagues in the art world describe him as someone who operated at a high level…He seemed to be a prodigy.").

Philbrick offered Rob the opportunity to invest in the ██ deals, but only after he had placed the first acquisition into his own company and not the joint venture, Rob agreed for two reasons. First, he could see the writing on the wall. The conflicts between ██ and Philbrick would continue, with Philbrick's funding appetite always outstripping ██, and both of them operating outside their agreement whenever they saw fit. Understanding this, Rob had begun to realize his vision of the future was unlikely to materialize within the joint venture. His belief in Philbrick, however, was more robust than ever. After seeing Philbrick reap incredible profits in trade after trade up close for two years, he was all the more certain he had come across a once-in-a-generation talent whose skill could serve as the profit engine for an incredible business. He had also seen time and again the value his business acumen brought to the commercially benighted gallery world. Rob wanted to invest with Philbrick and ██ because his hopes for the future were shifting away from the joint venture and towards a partnership with Philbrick.

The second reason was simpler: The painting Rob had invested into had just been sold for a solid but sober profit of 10%, and he now had nearly £90,000 that he could place into a ██ deal on the same terms as Philbrick's, effectively leveraging his investment if Philbrick produced his typical, spectacular returns.[11]

Rob was working for ██ however, and while the terms of ██ and Philbrick's agreement permitted Philbrick to work with ██ Rob investing in those deals was, he believed, a clear violation of his employment contract. As noted, he writes that he should have said no. This is particularly obvious in hindsight, not only because of where this next step on the path with Philbrick eventually led, but also because from this point forward, Rob had something to hide. He

---

[11] On the prior deal Rob invested into, ██ had taken an unusual leading role, identifying a buyer for a painting prior to its acquisition knowing it suited his taste, and incorrectly promising a much higher resale price than the eventual 10% above acquisition.

viewed the breach very seriously, consulting a lawyer in worry about his possible exposure. His desire to keep this secret created a concern that helped bind him to Philbrick going forward, for if Philbrick or ███ ever decided to tell Rob's secret to ███ Rob thought his reputation and career would be over.

Rob knew he should have said no at the time, too – that is why he was concerned; he knew what he was doing was wrong – but it is worth noting the context in which he breached his contract. As discussed, since starting at ███ Rob had witnessed both ███ and Philbrick serially violate the terms of their agreement, with each buying and selling works without telling the other. Indeed, his most important job for ███ (at least from a profit generation perspective) was overcoming the stresses these breaches placed on ███ and Philbrick's relationship in order to keep the joint venture alive and secret from the other ███ executives. Rob had seen that these two experienced art world figures did not consider violating an obligation not to invest in art outside a contract as a sin. In fact, it was commonplace.

It also bears noting that these breaches were not the only questionable conduct Rob had come to see was common practice in the gallery world. The first was "bearding," something both Philbrick ████████████████████████ ███ engaged in enthusiastically. As noted above, galleries sell their most in-demand artist's new work on the "primary" market far below its true, "secondary" market value, to collectors or museums whose ownership of the work raises the value of the artist's prior and future work. This rewards prior collectors and, therefore, helps maintain robust primary and secondary markets for the artist's work over the long term – something the artists, who are of course able to choose which gallery represents them, are keenly aware of. Bearding involves using a straw buyer (the "beard") who either *is* the sort of collector who could access these works on the primary market from a

34

gallery, or pretends to be.  Working on behalf of the actual buyer, the beard buys in the primary

market at the artificially low price, and is paid back when the actual buyer purchases it from them

at a pre-agreed-upon mark-up.  This leaves the actual buyer free[12] to sell the work on the secondary

market at its actual market value – a significant and immediate profit on the arbitrage.

    Rob witnessed ███ and Philbrick acquire works via beards repeatedly during his time

at ██████.  Philbrick used a variety, ranging from a movie star collector to a billionaire

collector's art advisor pretending to be purchasing on his boss's behalf to a discerning Japanese

collector who did not exist (played by the Japanese friend of one of Philbrick's collector friends).

██████ used physical beards on occasion, but since he was mostly buying works from ██████

for his own collection – a taboo that would harm ████████ reputation with its artists – and

thus personally signed off on the sales, he easily got by using made-up collectors ████████

████████████████████████████████████████████████████████

██████████████████

    Rob also witnessed both ████ and Philbrick pay for artworks with money they acquired

from the sale of the same work – i.e., selling it before they owned it and using the sale proceeds to

buy it.  Far from taboo, not only ████ and Philbrick, but also ██████████████████

celebrated these instantly profitable trades.  ████ also noted disapprovingly, but matter of

factly, the way Philbrick had stretched ██████ money during the era prior to the joint venture

through "teeming and lading," a practice he explained to Rob involved using the cash from one

sale to pay the creditor of the last purchase.

---

[12] This is not perfectly accurate.  To prevent bearding, galleries make collectors sign agreements giving the gallery right of first refusal for any resale within a given period of time following a sale. These agreements are, however, regularly breached without consequence.

Another form of creative accounting involved ██████ use of more than €20 million owed to a French artist to finance itself, a "win win" given the funding's benefit to ██████ and the artist's preference not to receive the money and pay a new, and what he hoped would be short-lived, 75% French super tax on earnings above $1 million.

██  ████████████████████████████

██ too, liked Rob's proposed plan for how they could proceed together with Philbrick, and they and Philbrick soon made an initial acquisition, with Rob investing his own money alongside Philbrick's. Philbrick sold the piece months after buying it for $1.2 million, nearly double the purchase price.[13] ██ (and Rob) were eager to do more deals, and at least ten followed over the course of 2015 and 2016. Rob did not play a significant role, and the scale and pace of the acquisitions soon outstripped his resources,[14] but he had served as the go-between in reaching ██ arrangement with Philbrick, and he continued to serve in that role, passing information back and forth and serving as what he terms the "oil' in the relationship, which mostly involved trying to salve ██ frustration at Philbrick's constant delays between a sale and ██ receipt of their profits. Of this, Rob writes, "I now understand the reason, but at the time I didn't question Inigo's explanations." Robert Newland Ltr., Ex. A, at 6.

As to his own investment, Rob put just under £90,000, a large percentage of his life savings, into the first deal. When he doubled his money, he reinvested, and over the course of the two years, despite his inability to keep up with ██ and Philbrick, his investment grew to more than $500,000 (on paper, as reported by Philbrick).

---

[13] Rob has no idea if these deals were real and the profits legitimate.

[14] Philbrick offered to loan Rob the money so he could continue to invest. He accepted for a time, taking it as a sign of friendship and Philbrick's growing recognition of his value, but despite the profits, the volume and size of the trades soon caused him to drop out, not wanting to get in over his head.

Rob had seen this kind of performance from Philbrick for years, but now he was benefiting personally, more than quadrupling his life savings in under two years.  The idea of forming a business with Philbrick had become ever more attractive. Philbrick had proven his ability time and again, Rob liked him and was profiting from their relationship, and while he was appreciated and happy at ██████ he came to feel meeting Philbrick had been kismet, and their forming a future business together had become his goal.  Philbrick also seemed to value Rob more and more too, and their relationship had continued to grow.  They still met up once or twice a month, but after Rob charted the path forward with ██ Philbrick started calling in between, asking for Rob's take on the terms of a financing arrangement, or to look over a contract, or to help him discuss an issue with the joint venture.  He and Rob discussed the idea of going into business together, but while Philbrick always seemed encouraging, nothing came of these discussions.

In the summer of 2016, with the idea of more fully demonstrating his value and taking the first real step toward a business together, Rob suggested to Philbrick that he quit ██████ and form his own consulting business, with Philbrick as his main client.  Rob would take over Philbrick's back office and Philbrick would be freed to do what he did best.  To Rob's excitement, Philbrick agreed and offered to match his ██████ salary, paying him fees of $20,000 a month for just 50% of his time.

Philbrick's generosity as to fees was great, but it was not the cause for Rob's excitement. When he gave ██████ six-months' notice in June 2016, he had seen Philbrick's unblemished track record up close for years, and in the books for years earlier.  He had bet his life savings on Philbrick . . . and watched it multiply by five in two years.  He was sure that with his help, Philbrick's business would grow, and he would soon see the need to make him a full partner, managing the

operations and sales team of a large and thriving business.  He had always wanted to start his own company.  Rob was at the start of something exciting.

He had no idea where it would lead.  Rob had some misgivings about Philbrick – he found him alarmingly carefree about breaching his agreement with ██████ (as opposed to ██████ who would instruct Rob to amend the agreement to allow whatever breach he committed) – but he had not seen anything that raised serious concerns.

That changed in the fall of 2016.  A few months after Rob had given notice but was still working at ████████ Philbrick called to ask for his thoughts on a contract governing a possible long term relationship with a funder with whom Philbrick had already done several deals.  Rob quickly spotted a disadvantageous term for Philbrick and suggested a revision to fix it.  But rather than renegotiate, Philbrick said he would "stuff him."  Rob had learned the term from Philbrick over the course of the ███ relationship.  It described a situation in which a gallery or art dealer acting for a collector would advise the collector to buy a work the dealer knew to be illiquid and/or overvalued, typically in order to take it out of the dealer's collection or to support an artist in whom the dealer or gallerist had an interest.  Philbrick had explained to ███ that they had been stuffed by prior co-investors after ███ showed him various works in their collection they were having trouble selling.

Rob describes Philbrick mentioning his plan to stuff his potential new funder as "THE moment where I should have ceased working with Inigo," because it "revealed a side of his character I hadn't seen before."  Robert Newland Ltr., Ex. A, at 7.  But he went forward nevertheless because he had already resigned from ████████ and because he was poised to take a huge step toward his longstanding goal of starting a business with Philbrick via the consulting arrangement.  Finally, he was sure that once he took the reins of the business (something he now

chastises himself for ever believing would happen), he would be able to put an end to any behavior he did not like.  He considered it pointlessly risky to cut any corners when Philbrick's core business was so incredibly successful, and he was sure Philbrick would agree.

Rob was in no way aware that Philbrick was committing fraud.  Indeed, after decades building an unglamourous but exceptional resume, a highly successful four years at ███████ created options in the art world (including staying there).  He left his high-paying, high-prestige, but not-very-demanding job to join Philbrick, full of hope that together they could build an extraordinary business.

### 4.        Joining Philbrick's Fraud

In January 2017, Rob began consulting for Philbrick and his role in Philbrick's business changed dramatically.  Since meeting Philbrick, Rob had been a sympathetic ear and *ad hoc* business advisor/contract reader.  He was now a fully engaged, professional consultant, charged with making Philbrick's business grow.

From the inside, Rob saw Philbrick's business was in chaos.  Key financial records did not exist, others did not seem to match what Philbrick had told him, and he quickly understood that Philbrick gotten into a "vicious circle" of teeming and lading.  Robert Newland Ltr., Ex. A, at 8. Rob did not consider this fraud at the time.  As noted, he had seen something similar at ███████ ███ and learned the term from the gallery's CFO.  It struck him as a terrible way to run a business, but to the degree that he could see – as noted, the records were piecemeal, and much of the information existed only in Philbrick's head – despite the current cash crunch, Philbrick's overall business looked viable.

From here, Rob's descent into the depths of the fraud was like Hemingway's proverbial bankruptcy, "gradually, then suddenly."  *See*, ERNEST HEMINGWAY, THE SUN ALSO RISES 42 (Scribner 1926). To free Philbrick up from the back office work and allow him to focus on making

the deals that would correct the cash crunch, Rob immediately took over administration for ███,

an art lending company from whom Philbrick had been taking loans secured by works of art.

███ needed documentation to support collateral for an upcoming loan, and when Philbrick

provided a bank statement for Rob to forward, he suspected it had been doctored.   When he

confronted Philbrick about it, Philbrick said, "don't ask," and explained that the loan would

quickly be paid off by an upcoming deal.   He was breezy and confident, as always, about his short

and long term prospects.   He even offered to send the paperwork along himself if it was a problem

for Rob.   Rob sent it along.

He did not see this for the significant step it was.   Rob believed deeply in Philbrick – he

had bet his life savings and career on him – and when Philbrick assured him the crisis was

temporary, and forwarding along a document someone else had doctored was necessary to save

the business, it did not strike Rob at the time as deciding to engage in fraud.   He told himself all

young businesses have hard times, he just needed to persevere.

Philbrick did quickly pay off the loan.   But in the weeks and months that followed, step by

step, first small, then larger, Rob's participation grew until, in time, he had become the day-to-day

back office for Philbrick's fraud.   He forwarded faked documents, repeated Philbrick's lies to

investors or their assistants, and helped Philbrick strategize about who to pay and when in order to

keep what he thought of as the business, but was really the fraud, from collapsing.   He used his

training to play out financial scenarios and brainstorm possible solutions.   He had become a

material member of what was and would continue to be a significant fraud.

### 5.      Why Did He Do It?

At this juncture, it makes sense to turn to Your Honor's question.

Why did this smart, hardworking, honorable and talented person, a loving and committed

husband and father, a leader of his birth family and pillar of his community, not only commit this

crime, but sacrifice nearly two years' salary to do so?[15]  Why didn't he just turn around the second he saw what Philbrick was doing?

In his letter, at each step along the way, Rob explains why.  The detail of this self-examination, including his honest, unsparing and unsympathetic self-disgust, is critical to fully answering Your Honor's question.  Viewed from the outside, with more sympathy than Rob affords himself, it is a sadly human story, laced with good as well as bad, strength as well as weakness, empathy as well as deceit.  It is also tragic in classical fashion, with many of the traits that would have made Rob the man you wanted in your foxhole had he set his sights on going into a business struggling for non-criminal reasons, causing him to stick with it, try to fix it, and dig his hole deeper and deeper.

Rob characterizes his actions at various decision points along the way pejoratively – his dream of building a world-beating business with Philbrick driven by greed and ambition; his failure to spot the warning signs before he joined the fraud attributable to foolish naivete and poor judgment clouded by his vision for the future, together with a false pride that he could cure any issues he saw in his hoped-for future partner.  His decision not to leave Philbrick immediately was rooted in fear of the consequences if his breach of his ███████ employment agreement came to light, and his failure to understand the gravity of the situation, and his idiotic willingness to put his and his family's fate in Philbrick's hands.  Finally, his decision not to leave once his day-to-day work became telling lies and strategizing about how to keep it all from collapsing, was a combination of fear, weakness and shame.

There is real truth in each, but the upstanding man detailed so overwhelmingly in the 96 letters is also present – the optimism, vision and energy to set a goal, pursue a dream and fight

---

[15] Philbrick paid Rob $20,000 for the first month.  He received no other pay for the time he worked for Philbrick.

through obstacles to get there; the willingness to assume responsibility and help fix other's problems; and the empathy, hopeful naivete and generosity to see the best in others.

Rob joined ██████ with the best of intentions. His new job would be less demanding, allowing more family time, but it was also a fun new challenge in a fascinating new world where his business training set him apart. His ability to see the path from Philbrick's talent to the company that could best capture and scale it was precisely why ██████ had hired him. He worked dutifully toward achieving that goal within ██████ and Philbrick's company for more than two years.

Rob is right that his decision to invest in the ██████ deals, shifting his ambition for their future company from the joint venture to one that would not include ██████ was a major fork in the road where he picked the wrong direction. He was happy to invest, but he breached his contract primarily in hopes of achieving his dream of building a great business. He created civil liability for himself by doing so, but if he had built what he thought he could based on what he had seen from Philbrick, this would be a footnote in that company's backstory of little interest or significance. It would be what happens in business by those with the ambition and drive to build great companies – when a path is blocked they seek another, and taking real risks, including financial exposure, is a necessary part of achieving a dream.

Rob continued to work hard and well for ██████ for another two years – his ██████ colleague from that era describes him as a person who "unselfishly and tirelessly worked to support and do the job he was hired to do better than anyone I've seen."[16]  Graham Steele Ltr., Ex. B.6, at 2. But seeing his path closed, he shifted his entrepreneurial hope for the future from him, Philbrick and ██████ to him and Philbrick. If it had all worked, what he had seen was true, and Philbrick

---

[16] Rob was informed by former colleagues that ██████ forbade its employees from writing letters to the court in support, but Mr. Steele now runs his own successful business.

turned out to be his generation's Gagosian and Rob the man who made it happen with his optimistic vision and willingness to see a new route up the mountain when one is closed, the same endurance and doggedness would have been critical to making his dream a reality.

Rob calls the next big fork in the road – Philbrick telling Rob he would stuff his funder – "THE moment" he should have dropped Philbrick and abandoned his hopes, explaining he did not do both because he was so close to taking a major step toward his long hoped for goal, and because he was sure he could control Philbrick and stop this kind of behavior once he was inside his company.  He castigates himself for both, viewing his ambition through the lens of greed and his belief he could control Philbrick in a business where he was a bit player as "incredibly naive and short sighted."  Robert Newland Ltr., Ex. A, at 7.  But in context, the choices he faced were far less black and white, and his decision, while ultimately and spectacularly wrong, understandable.

Rob's vision for the future was built on his faith in Philbrick and himself.  Both were justified.  He had seen Philbrick's performance, from before he began at ███████ in ██████ books throughout his four years observing it up close, and there was no reason to question it.  From 2011 through to the end of 2016, from █████ to ████ to the other sophisticated, wealthy collectors and the advisors who worked for them, investing in Philbrick's art trading ability paid off spectacularly.  And like all these others, Rob liked and trusted Philbrick.  Philbrick had helped him repeatedly, showing him the ropes of the art world, allowing him to invest and profit from Philbrick's talent by carving out a portion of the financing that Rob could afford, and then for a time lending him money to continue his participation, and most importantly, by extending his hand and giving Rob the chance to take real steps toward forming their long-discussed business.  Philbrick had done right by Rob, and while Rob had seen the smaller warning signs he noted prior to the stuffing call, none of it was particularly worrisome, especially within the context of the

freewheeling art world.  And that formed an important part of the backdrop, too – he had known Philbrick for four years and *had not* seen anything like this before.  He had every reason to believe his career bet on Philbrick would turn out as well as his investment had; every reason to believe he could achieve his dream.

Rob's faith at the time in his ability to prevent the kind of behavior he saw in the stuffing incident also makes sense.  He had not seen Philbrick do something like it before, and based on what he had seen, he justifiably perceived it to be wholly superfluous to their future business's success.  He also justifiably had faith in himself to stop it.  Rob's vision of his future with Philbrick did not sprout and grow in a vacuum.  He had been discussing it with Philbrick for more than four years by the time he embarked on it, and Philbrick's encouraging Rob to quit ███████ and come work for him was strong confirmation Philbrick understood Rob's value.  Why would Philbrick pay him $20,000 a month to ignore his advice?  And Rob's faith in his own value came from a lifetime of experience, as well.  He had succeeded not just at ██████, showing he added real value in the art trading space, but at every step before that, from making his way to LSE from Wales, to succeeding at ███████████ in the world of business, to personal achievements, ranging from rock climbing to an Iron Man triathlon to the dedication and tireless perseverance he showed building the family and community he wanted.  Rob had faith in himself because he had earned it over a lifetime.  Convincing Philbrick that he should not do dumb things to jeopardize their future was a job he had reason to believe he could handle.

On January 1, 2017, Rob became Philbrick's consultant, taking on the job of advising Philbrick's *business*.  That initial frame is important in understanding what followed.  He had not decided to embark on a life of crime at age 38.  But once inside, it was hard to suddenly cast away the frame.  He thought the teeming and lading was stressful, that the business was in trouble

because of it, but that once the current crisis was addressed, the money came in and the debts were paid off, he would be able to start with a fresh slate.

When confronted by the crises Philbrick's "business" faced, Rob's instinct was to dig in and fix them. He was built to solve business problems and he was also built to be optimistic, see the best in people and never give up. It was a bridge too far for him to understand that Philbrick was a criminal and his own vision for their future company a fantasy.

His denial was rendered easier because his first steps into the fraud were small and the solution was always in sight as long as he trusted Philbrick. And once Rob had solved this equation the wrong way once, like the frog who fails to jump out of the slowly heating water, each time, it made sense to solve it the same way again. Telling all the lies caused his stomach to turn, recognition of the overall situation led to his publicly breaking down and weeping at his gym one morning, but he accepted Philbrick's reassurance, and soldiered on in hopes that if they could just get through this current crisis, they would soon be out of the woods.

Throughout it all, Rob also clearly understood there would be significant consequences if he could not solve the problems in front of him and keep Philbrick's "business" (which he now sees, understands, owns and writes about as a fraud), from failing. Fear, weakness and saving his own skin drove him from the start – Philbrick's threat to take the losses of a collapse out on ██ would, he believed, ruin his career. But a collapse would also harm ██, who Rob liked and felt responsible for since he had suggested the terms by which they could work with Philbrick and helped their relationship along over the years. It would also harm all the other innocent investors he knew and did not know, as well as his wife, children and his wider family that he felt financially responsible for. If Philbrick could just do what he had done for more than five years straight, and was saying he not only could do but *was doing* – the huge sale that would make it all right was in

always sight, confidently and convincingly presented by the art world genius Rob had so recently felt so lucky and excited to join – the nightmare would be over, the lying could stop, the real company could begin.

Once he got in deeper, and became more and more ashamed of what he had done, his fear grew.  He understood a collapse would be followed by lawsuits, he would likely lose everything, and that all he had done would be exposed.  ███ and ███ liked and trusted him.  He liked them as well.  And yet he had betrayed them, over and over.  There would not be understanding because what he had done was unforgivable.  He could not let it come out, and if the next deal Philbrick, still breezy and confident, told him about came through, it would never have to.  Rob could escape unscathed.

Denial is a powerful thing, and when Rob left Philbrick in 2018, 20 months after he started, in his mind it was not to exit a fraud – he was disgusted with himself and what he was doing, but he had been for over a year – it was because he had finally lost faith in Philbrick.  Not altogether – right up until Philbrick fled Rob would still try to soothe his fears with slender reeds of hope that it could all pan out through the type of deal Philbrick used to pull off regularly.  But he finally understood he could not wait for the savior deal that never came.  He also realized what a fool he had been to put his fate in Philbrick's hands.  He had learned there was nothing he could do to materially affect the business.  He was admin: writing fraudulent emails, confirming and retelling Philbrick's lies, carefully updating the spreadsheet with all the positions Philbrick took so Rob could keep track of it all and try to help keep it from collapsing.  His idea that he could control Philbrick and stop him from doing things like stuffing, he had long ago realized, rested on his fantasy of a future role in a business that did not and never would exist.  He finally accepted that nothing would change.  What he had been doing made him sick, and so he left, agreeing to still

play a role in the Philbrick's dealings with ▮▮ for fear of what Philbrick would do – both to him and to ▮▮ – if he did not.  Fear and weakness continued to drive him, though: a little over a year after he left, ▮▮ directors, sensing deep trouble for the first time, asked him if there were problems with Philbrick's business. To his shame, Rob said no.

▮ ▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

---

[17] ▮▮▮▮▮▮▮▮

███████████████████████████████████

███████████████████████████

## ANALYSIS

**A.    A Lengthy Sentence of Home Confinement with Community Service Is Just Punishment**

The Court sentenced Inigo Philbrick to 84 months imprisonment for his role in the crime of conviction.  For the reasons set forth in Section 6 below, the sentence he will actually serve will be much shorter following the application of various Bureau of Prison reductions from which Rob as a non-U.S. citizen cannot benefit.  Philbrick is projected for release on December 31, 2024, 54 months and two weeks after he was arrested on June 12, 2020.[18]  However, he is eligible for "pre-release" home detention on July 3, 2024, which will cut Philbrick's incarceration to 48 months and three weeks, approximately 58% of his original 84-month sentence.  Many of the sentence reductions Philbrick is eligible for, and has used to dramatically shorten his time in prison, are not available to Rob as a non-U.S. citizen.

There is no question that Rob Newland is guilty of a serious crime.  But there is also no question – the government agrees – that it was Philbrick who began, drove, and controlled the fraud, with Rob in a supporting role.  The government also agrees Rob deserves a lesser sentence than Philbrick.  If the Court agrees, and Rob's sentence is determined (at least in part) in relation to Philbrick's – i.e., what percentage of Philbrick's sentence should Rob receive given his lesser culpability – then the Court should use Philbrick's actual time of incarceration as the correct comparative measure instead of his 84-month original sentence.  Because Rob is eligible for and would receive the same 15% good conduct credit that Philbrick is receiving and presumably will

---

[18] Information regarding Philbrick's prison sentence was provided by the United States Attorney's Office, and is attached as Exhibit C.  The United States Attorney's Office does not object to Defendant filing Exhibit C.

48

continue to receive, the true measure can be determined by adding 15% to Philbrick's actual term of incarceration of approximately 48.7 months, resulting in approximately 56 months as the true measure for Rob's sentence.

Based on this measure, for the reasons discussed below, a lengthy sentence of home confinement in conjunction with community service would be a merciful, and also just sentence, "sufficient, but not greater than necessary" to accomplish the goals of sentencing set forth in Title 18, United States Code Section 3553(a).  *See Gall v. United States*, 552 U.S. 38, 47 (2007).

### 1.    Rob's Role – In Contrast to Philbrick's – Warrants Leniency

Rob has fully accepted responsibility for his role in the crime to which he pled guilty and stands convicted.  It is not excusing that conduct to underscore the many ways that Rob, while Philbrick's co-conspirator, was not near his equal, and bears nowhere near the same moral culpability.

To begin, Rob did not join Philbrick intending to engage in fraud.  He still has no idea which, if any, of the spectacular Philbrick trades he saw in ▆▆▆▆▆ accounting books or observed over the ensuing years were real and which, if any, were fake.  Rob pursued his dream of starting a great new company with Philbrick, and then made the monumental mistake of not quitting the second he saw behind the curtain.

When Rob stayed in the fraud despite seeing how Philbrick ran his company, he did not do so in order to profit from victim losses.  He did not squander investor funds or put them in his pocket.  Rob committed the crime, but did so with the goal of paying off everyone Philbrick owed money, ending the need for continued lying, and, at least for a time, still hoped that he could then begin building the legitimate business that was his long-held goal.  When Philbrick made a sale (and told him about the funds), Rob used them to pay off the fraud's victims.  He did not spend a

dime on himself, and was horrified each time Philbrick continued to dig a deeper hole, buying new works and creating a new debts instead of paying debts owed.

To this point, as the Court presumably recalls but still bears repeating, Philbrick spent extravagantly not only on his artistic bets, but he chose to live an astonishingly extravagant, debauched existence.  He routinely used victims' money on private jets, luxury vacations, drugs, prostitutes, and staggeringly expensive clothing.  By contrast, Rob rode his bicycle to work, drove (and still drives) a 10-year-old, second-hand Skoda (a low-end Volkswagen subsidiary that has yet to crack the U.S. market), wears sweaters ("jumpers") knitted by his mother, and – as is their preference – goes camping with his family for school vacations when they are not visiting his parents' home near the soggy Welsh coast.

Also unlike Philbrick, Rob did not flee, hide or squander victim assets, or drain cash that could be used to repair losses as the business collapsed.  Rob left Philbrick over a year before, and although he should not have stayed the 20 months he did, nor helped in Philbrick's fraud, he did leave.  Philbrick still occasionally called and copied Rob on emails after he left – as noted, Rob was not fully out of the fraud and still denied its existence when confronted by ███  But for the year prior to its collapse, Rob had no insight into the fraud's finances, Philbrick's deals, who had been paid, or what was owed whom, or the status and location of the art.  So when the fraud collapsed and Philbrick fled and squandered or looted the victims' assets, destroying much of the value that could have been salvaged, Rob was in the dark.

Finally, it is also relevant to note that Rob not only did not profit from any of the victim's losses, but instead lost significant earnings through his participation in the fraud.  With the exception of the $20,000 Philbrick paid him for the first month's consulting, Rob's forfeiture did not consist of profits from the fraud.  He forfeited the three paintings and desk he received from

50

Philbrick as payment on investments he made in Philbrick trades before he was aware that Philbrick had been engaging in fraud.  The remainder of the forfeited cash consisted of funds Philbrick loaned him (and which he shortly repaid) to pay taxes on the investment's profits.  But because he received the money and items *after* he began working for Philbrick and became liable as his co-conspirator, any money or object transferred from Philbrick was forfeited.  Rob's actual profit from his work for Philbrick was $20,000 – less than one-tenth his annual salary at █████ ████ before he quit to join Philbrick.  Had Rob not left █████████ to go into business with Philbrick, he would have earned approximately $400,00 during the 20 months he spent with Philbrick.  Thus, Rob effectively paid $380,000 to participate in the crime, working to help prop up Philbrick's fraud at the below poverty-level rate of $250 a week.

Rob's failure to profit from the fraud not only radically distinguishes him from Philbrick, but also from the "heartland" of fraud offenses, and supports a non-custodial sentence.  *See United States v. Collins*, 07-cr-01170 (S.D.N.Y.), Sent'g Tr., ECF No. 244, at 21:19-22:6; 30:1-5 (July 15, 2013) (defendant not personally profiting directly from the fraud took the conduct "far outside the heartland of fraud cases"); *United States v. Graham*, 06-cr-00137 (D. Conn.), Sent'g Tr., at 64:4-13, 69:18-21 (Apr. 30, 2009) (that defendant "did not personally gain in a direct way from his criminal conduct" warranted substantial downward departure from Guidelines); *United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wisc. 2005) (downward departure warranted where defendant acted to "keep a sinking business afloat"); *United States v. Costello*, 16 F. Supp. 2d 36, 39 (D. Mass. 1998) (downward departures warranted where there is a large disparity between loss and gain).

While Philbrick did get something for this money – Rob repeatedly acknowledges his superior administrative organization, trustworthy profile, and strategic advice helped keep the

fraud afloat (thereby expanding and inflicting more damage), it was only Philbrick in the driver's seat.  Rob made no deals, did not meet the vast majority of the victims, and typically learned about a new work or investor after the fact, when Philbrick happened to mention it.  His role was trying to solve the problems Philbrick created – to work to keep it all from crashing down.  The law appropriately holds Rob accountable for any of the fraud of which he was or should have been aware, but it is telling that he was not aware of tens of millions of losses, and that the majority of his restitution accrued because of a spreadsheet he created to try to understand and correct the chaos he discovered.  Rob created and updated the spreadsheet with information Philbrick provided him – he had to, because Philbrick was his source of information – and through this process, he was keeping a careful written record of the fraud.  That included capturing his awareness of many instances of fraud in which his sole involvement was just that – keeping track of it on a spreadsheet aimed at keeping the whole thing from collapsing.

Rob is guilty, and his actions contributed to the fraud and hurt its victims.  But his role and conduct paled in comparison to Philbrick's, and we respectfully request the sentence reflect the degree to which their crimes are not equal.



    **2.**      **The Extreme Aberration from Rob's Extraordinarily Selfless, Generous, Family and Community-Focused Life Warrants Leniency**

As the 96 letters supporting him amply demonstrate, Rob Newland's character was established long before he met Inigo Philbrick.  He is not revealed by the fraud.  Rather, its stark counterpoint to who he is and who he consistently has been over his lifetime underscores just how aberrant his behavior was.

Numerous letter writers said that they wished they were more like Rob, repeatedly noting the generous time and care he provides to everyone in his life.  Reading the 96 letters brings to mind the final scene in Frank Capra's "It's A Wonderful Life," when a community selflessly bands together to repay a lifetime of good deeds by Jimmy Stewart's George Bailey.  It is not the quantity of letters – though they alone speak volumes – it is the time and exquisite effort placed into them.  When the call went out that Rob Newland needed help, people across the UK settled in behind keyboards to try to return to return to Rob what he had always provided each of them – generous time and thoughtful solutions.

The letters are as heartbreaking as they are heartwarming, and they underline the extraordinary tragedy at the center of this case.  Rob Newland was not a person who engendered worry or cause for concern, he was the kind of person they wanted to be more like.  And, as detailed in the extraordinary letter quoted at length above, they were inspired to follow Rob's lead, and doing so, theirs became a tight-knit community unlike the anonymous one that existed before the Newlands arrived.  *See supra* pp. 23-24.  Through the accretion of the near endless list of individual acts of generosity – an autistic child feeling included, a plumber learning to grow his business, a gang of neighborhood kids having a chasing game to look forward to every Sunday – Rob not only gave to his community, he, in many ways, created it.  It is a fairly odd thing to say in a sentencing

memo, but if the world was full of more people like Rob Newland, it would be an exponentially better place.

The extreme breadth and volume of Rob's service to others – not just the weekly charity work at the soup kitchen, or his devotion as a husband, father, son, brother and friend, but the extraordinary generosity to everyone he comes in contact with and who make up his life – does not just underline how fundamentally good he is, and thus how unusually aberrant his offending conduct was, but itself provides a separate basis for leniency. *See United States v. Fan Wang*, 1:14-cr-00411 (S.D.N.Y.), Sent'g Tr., ECF No. 29 at 24:19-26:17 (Nov. 19, 2014) (imposing below guidelines sentence of three months of incarceration and three years of supervised release, crediting defendant's service to the community through tutoring students); *United States v. Smith*, 387 F.3d 826, 834–35 (9th Cir. 2004) (district court's belief that it could not depart based on aberrant behavior was clearly erroneous in part based on many letters of support submitted on behalf of defendant indicating that the defendant had lived an exemplary life prior to the crime, and that the crime represented a departure from her normal way of life).

In coming to his aid via their letters, Rob's extensive network of friends, family, colleagues and neighbors recognized that when someone who has lived a life defined by generosity stumbles, the right response is to help and give back. We most respectfully request that in deciding the appropriate punishment, the Court follow their lead, and standing in for the community, give Rob, his family, and the community that needs him, the gift of leniency. It is something Courts have recognized in appropriate circumstances, and Rob Newland is deserving of it. *See United States v. Nesbeth*, 188 F. Supp. 3d 179, 193 (E.D.N.Y. 2016) (imposing non-custodial sentence where defendants' crimes "were certainly a marked deviation from an exemplary law-abiding life"); *United States v. Mullings*, 131 F. Supp. 3d 1, 4-5 (E.D.N.Y. 2015) (imposing non-custodial

sentence where court concluded that fraudulent conduct was aberrational and a custodial sentence would cause unnecessary detriment to defendant's wife and young children); *United States v. Schulman*, 16-cr-00442 (E.D.N.Y.), Sent'g Tr., ECF No. 155, at 26:22-24, 38:14 (Oct. 6, 2017) (varying from 41 to 51 month Guidelines range and imposing non-custodial sentence where defendant's securities fraud scheme was "truly aberrant"); *United States v. Diambrosio*, No. 04-cr-66, 2008 WL 732031, at *3 (E.D. Pa. Mar. 13, 2008) (varying from 46 to 57 month Guidelines range and imposing non-custodial sentence where $2.8 million fraud scheme was "a marked exception to an otherwise law-abiding life").

### 3.    Rob Has Already Endured Years of Real, Life-changing Punishment

Rob's participation in the crime, his arrest, and guilty plea have laid to waste much of what he spent his life carefully building.

His entire family is in a state of purgatorial crisis.  A man so dedicated to family that he woke up early as a teenager to be able to see his father before he left for work, woke up even earlier to be able to finish two hours of cycling and be home for his girls' breakfast, twice took steps down the salary and prestige ladder to be able to spend more time at home, and dedicated himself to his family's care with deep and selfless dedication, ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

On top of all this, he has financially ruined his family.  The money he and ███ carefully saved for their and the daughter's futures is gone to attorney's fees.  Rob, once so eager to provide he assumed financial responsibility for his siblings and parents, has lost the ability to support even his own family.  Despite his standout performance, his last two employers fired him because of this crime.  It is unlikely any future employers will consider hiring him.  Rob hopes to start a company making play tables or designing mobility aids, and given his extraordinary energy, talent and skill, he just might succeed.  But he knows better than anyone his ability to secure a job for a company with the skills he worked his life to develop is behind him.  *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (destruction of a defendant's career and livelihood is "substantial punishment" that lessens the need for further punishment); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) (downward departure where defendant EPA tester's livelihood was destroyed).

Rob has also lost much of his sense of self.  He perseveres with exceptional energy and fortitude, still doing all he can to take care of his family through acts of service if not earning. And the letters make plain how devoted his family and community are to him.  But his self-shame and disgust are deep.  They are referenced in letter after letter, and their effects unlikely to disappear any time soon.  Try as he may with the brave face he puts on:

> Rob has broken and will never recover. He was such a buoyant,
> optimistic person, with such deep faith in himself. That is gone,
> replaced with disappointment and disgust.

███ wife), Ex. B.1, at 7.

Courts in this District and elsewhere in the Second Circuit often show leniency where a defendant like Rob expresses deep remorse, shame, and disgust about their crime.  *See, e.g.*, *United States v. Anderson*, No. 18-cr-71, 2021 WL 776975, at *8 (W.D.N.Y. Mar. 1, 2021) (court granted nine month variance based on "Defendant's demonstrated remorse, pre-sentence rehabilitation,

and family ties and responsibilities”); *United States v. Ramos*, No. 12-cr-556, 2020 WL 7128967, at \*2 (S.D.N.Y. Dec. 4, 2020) (court granted downward departure to mandatory minimum sentence based in part on defendant's genuine remorse and “deep regret” for his actions); *United States v. Mack*, No. 17-cr-138, 2020 WL 6161255, at \*1 (E.D.N.Y. Oct. 21, 2020) (court granted 15-month downward departure based on defendant's remorse and participation in reentry rehabilitation programs).

These effects have all been amplified by the slow moving-nature of the case.  Rob was fired from ████████████ in 2020 upon Philbrick's arrest, and he and his family have been suffering from the fallout from his actions for years.  The period has imposed significant punishment on Rob and his family.  Courts recognize it as another reason for Your Honor to show leniency.  *See United States v. Anderson*, 260 F. Supp. 2d 310, 317 (D. Mass. 2003) (imposing sentence that was “minimally sufficient” to “generally deter others from committing comparable crimes”); *see also, e.g.*, *Gaind*, 829 F. Supp. at 671 (loss of defendant's business, assets, and income “constitutes a source of both individual and general deterrence”); *United States v. Warner*, 792 F.3d 847, 854 (7th Cir. 2015) (finding sentence of probation for billionaire convicted of multimillion dollar tax evasion scheme carrying a Guidelines range of 46 to 57 months substantively reasonable in light of district court's recognition of the severe collateral effects of defendant's “highly publicized prosecution”).

### 4.    Incarceration is Unnecessary for Fair and Appropriate Punishment

Section 3553(a) mandates consideration of the types of sentences available to achieve the Court's objective of imposing a fair and appropriate sentence.  As discussed herein, this case presents a compelling opportunity to consider a non-incarceratory sentence.  A sentence of home confinement with community service is available here, would provide just punishment, and avoids

the additional and unnecessary trauma to his family that imprisoning Rob 5,000 miles from home would entail.

As detailed throughout this submission, this case has had a profound effect on the mental health of Rob's wife and young children. It goes without saying that his imprisonment in a foreign country with limited ability for his wife and children to visit would risk profound and lasting harm to each of them, not to mention his birth family and local community. As set forth in Section A and in the letters submitted to the Court on Rob's behalf compiled at Exhibit B, Rob's continued presence is critical to ███████████████, development and well-being, and his incarceration across the Atlantic would be, at the least, a devastating blow to their developing senses of identity. Courts have found this type of family obligation a basis for leniency. *See United States v. Prosperi*, 686 F.3d 32, 42 (1st Cir. 2012); *United States v. Sclamo*, 997 F.2d 970, 974 (1st Cir. 1993) (affirming non-custodial sentence for defendant convicted of cocaine trafficking in light of role as caregiver to adolescent); *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (affirming downward departure where district court concluded that defendant had a "close-knit family whose stability depend[ed] on [his] continued presence").

Courts have also recognized that non-incarceratory sentences constitute real punishment. *See United States v. Leitch*, No. 11-cr-609, 2013 WL 753445, at *12 (E.D.N.Y. Feb. 28, 2013) (a probationary sentence is "*significant* punishment") (emphasis in original); *United States v. Zimmerman*, No. 10-cr-598, 2012 WL 3779387, at *6 (E.D.N.Y. June 19, 2012) ("Imprisonment is not the only way we punish. Supervised release brings with it a series of significant restrictions on a defendant's liberty.") (citing *Gall*, 552 U.S. at 48-49).

Courts can and do impose sentences of home confinement where defendants reside in the United Kingdom. *E.g.*, *United States v. Sarao*, No. 15 CR 75 (N.D. Ill. Jan. 28, 2020) (U.K.

defendant sentenced to home confinement for $13 million market manipulation scheme).   The Court can be wholly confident that Rob would comply with a sentence of home confinement, and monitoring through randomly timed telephone and/or video calls is practical and easy to implement.

For all of the reasons above relating to Rob's positive engagement with his community, the community service component of a sentence of home confinement presents the Court with an opportunity to create something uniquely positive from what is otherwise a difficult and painful time for all involved.  Rob would undoubtedly engage with his service obligations vigorously and sincerely, to the genuine benefit of whatever community he is ordered to serve in.   Should the Court wish to pursue this option, we can readily identify numerous charitable organizations near Rob's home that will engage him as a volunteer for the requisite number of hours.

A sentence of community service under 18 U.S.C. § 3563(b)(12) is strongly encouraged in appropriate cases.  The Administrative Office of the United States Courts has observed, for example, that community service is "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community.  It is practical, cost-effective, and fair—a 'win-win' proposition for everyone involved. . . .  Community service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation . . . .  It restricts offenders' personal liberty[,] . . . [and] allows offenders to atone."[20]  In selecting appropriate candidates to perform community service as part of a probationary sentence, the Office of Probation and Pretrial Services recommends that courts "look for offenders with personal and social stability, who are willing,

---

[20] Court & Community: An Information Series about U.S. Probation and Pretrial Services: Community Service, Office of Probation and Pretrial Services, Administrative Office of the U.S. Courts (2007), *available at* http://www.kywp.uscourts.gov/court_comm/ccmtmsvc.pdf.

motivated, and who have no history of violence." *See id.* at 2.  Community service in London can also be easily monitored by Probation.

Here, Rob's exceptional generosity, devotion to others, and his extraordinary positive effects on all of the lives he touches, as well as his unflagging energy and range of personal talents make him an ideal candidate for community service as an alternative to incarceration.  It is a sentence that would create some good, and permit Rob to create some good, from the pain he has caused, first and foremost to his victims, but to his equally innocent family as well.  Harsh consequences to innocent loved ones are a standard side effect of sentencing, but they are not a required and/or necessary component of it.  Allowing Rob to further exercise exactly what makes him so remarkable in the service of his community, rather than denying his contributions to it, would replace both his community's and his family's additional loss and pain with growth and joy – the Court has nearly 100 letters testifying to Rob's lifetime of selfless service to support this theory.  Rob can serve his sentence in any number of local charities, including the one at which he already volunteers, and his gift with children would bring a significant benefit to any needy organization, but we respectfully request Your Honor consider his father's suggestion and permit him to serve either at a home or homes for the elderly, providing his energy to communities that are often overlooked, and sorely in need of it.  Indeed, a home care facility would be a place where he can use his problem solving ability to spot issues and improve its functioning and, perhaps, to learn better how to make the improved mobility aids he envisions building with his father.

### 5.    No Need for the Deterrence Effect of Incarceration

There is clearly no need for a prison sentence to "protect the public from future crimes" by Rob.  18 U.S.C. § 3553(a)(2).  Rob did not set out to commit the crime of conviction, he has no prior criminal history, and he has already endured significant punishment, his participation in the crime destroying much of the life he built and his future, and severely damaging those he loves

most. He has also readily and robustly accepted responsibility for his actions, ███████████ ████████████████████████████,[21] and struggles with a profound sense of remorse and shame. There is simply no reason to believe Rob will ever commit another crime. *See United States v. Johnson*, No. 16-cr-457-1, 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) (no need for specific deterrence where it is "highly unlikely that [defendant] will work again in . . . the financial services industry"); *United States v. Emmenegger*, 329 F. Supp. 416, 428 (S.D.N.Y. 2004) (no risk of recidivism where offense was "particularly adapted to [the defendant's chosen career," "[t]hat career is over, and his potential to commit this particular type of crime has been eliminated"). There is no need for specific deterrence.

With respect to general deterrence, the severe, personal, professional and financial consequences Rob has already suffered as a result of his offense are on their own more than sufficient to deter others from committing similar crimes. *See Anderson*, 260 F. Supp. 2d at 317 (imposing sentence that was "minimally sufficient" to "generally deter others from committing comparable crimes"); *see also, e.g.*, *Gaind*, 829 F. Supp. at 671 (loss of defendant's business, assets, and income "constitutes a source of both individual and general deterrence"); *Warner*, 792 F.3d at 854 (finding sentence of probation for billionaire convicted of multimillion dollar tax evasion scheme carrying a Guidelines range of 46 to 57 months substantively reasonable in light of district court's recognition of the severe collateral effects of defendant's "highly publicized prosecution"). Rob's prosecution, however, does not exist in a vacuum. As the leader and face of the fraud, Philbrick's highly publicized sentence sent a clear, loud message that fraud in the art world is real crime and will be punished as such. The Court acknowledging the extraordinary

---

[21] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

factors that merit leniency toward Rob and reflecting that in a sentence narrowly tailored to who Rob is, what his role in the crime was, and what just punishment is as for him, will hardly blur that message. A prison term is not necessary to dissuade Rob or others from committing future crimes. *See Stewart*, 590 F.3d 93 at 141 (affirming non-custodial sentence and noting that "the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant"); *United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (affirming non-custodial sentence for tax offense and noting that leniency in defendant's case would not diminish the general deterrent effect of the prosecution).

### 6.  Incarceration In The U.S. Would Be Disproportionate Punishment in Multiple Ways

Section 3553 requires courts to consider "the need for the sentence imposed . . . to provide the defendant with . . . correctional treatment in the most effective manner." 18 U.S.C. §§ 3553(a)(3), (a)(2)(D). Rob's status as a non-citizen impacts this calculus in ways the Court should be aware of, and, we submit, in considering a just sentence.

### a.  Rob Will Do Far More Time Than a U.S. Citizen Serving the Same Sentence

To begin, as noted, the portion of his sentence Rob will actually serve in prison will be far longer than a similarly situated American defendant.

*First*, because Rob faces deportation immediately following his sentence, he cannot take advantage of recidivism reduction programs that are ordinarily available to prisoners. Generally, a prisoner "who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits[.]" 18 U.S.C. § 3632(d)(4)(A). Usually "[a] prisoner shall earn 10 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." 18 U.S.C. § 3632(d)(4)(A)(i). In addition, a prisoner determined "to be at a minimum or low risk for recidivating, who, over two

consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities."  18 U.S.C. § 3632(d)(4)(A)(i).  Time credits earned in this way are applied toward prerelease custody or supervised release.  *See* 18 U.S.C. § 3632(d)(4)(C). However, a prisoner who receives a final deportation order, as Rob will here, is not eligible for pre-custody release and cannot apply the earned time credits.   *See* 18 U.S.C. § 3632(d)(4)(E).[22] As a result, a foreign citizen who will be deported after serving their sentence often serves an additional 2-3 months for each year of the sentence imposed.

   *Second,* as a convicted alien Rob is ineligible for pre-release into a halfway house or home confinement.  *See United States v. Conti*, 14-cr-00272 (S.D.N.Y.), Sent'g Mem., ECF No. 229, at 24-26 (Mar. 4, 2026); *United States v. Navarro-Diaz*, 420 F.3d 581, 588 (6th Cir. 2005) (noting that convicted alien would serve "harsher time because [he would] not be eligible for halfway house placement").  As such, he will be forced to serve his entire sentence (less good time credit) in prison, whereas other comparable defendants—like Philbrick—typically transfer out of custody six months prior to their release date.  *See* 18 U.S.C. § 3624(c)(1).

   *Third*, when his prison sentence is completed, Immigration and Customs Enforcement (ICE) will be required by statute to immediately take him into custody and move him to an ICE detention facility where he will await deportation back to the U.K.  *See* 8 U.S.C. § 1226(c) (requiring detention of criminal alien upon completion of prison sentence)[23]; *United States v.*

---

[22] Information provided by the BOP via the United States Attorney's Office confirms that Rob would not be eligible for FSA credits if he is subject to a final order of deportation.

[23] Post-sentence immigration detention is required for any convicted alien who is "inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title."  See 8 U.S.C. § 1226(c)(1)(A).  Section 1182(a)(2) provides in turn that any alien "who admits having committed . . . a crime involving moral turpitude . . . or an attempt or conspiracy to commit such a crime . . . is inadmissible."  Here, U.S. immigration authorities will almost certainly take the position that the offense conduct is a crime of "moral turpitude" which renders Rob inadmissible and will require him to spend time in immigration detention following any sentence.  *See, e.g., Patel v. Holder*, 707 F.3d 77,

*Ramirez-Ramirez*, 365 F. Supp. 2d 728, 732-733 (E.D. Va. 2005) (post-sentence immigration detention generally "mean[s] a further term of detention until his removal has been completed"). And although Rob would not challenge his removal, deportation can involve material, and occasionally long delays.  *See, e.g., Handa v. Clark*, 401 F.3d 1129, 1132 (9th Cir. 2015) (noting that five weeks transpired between arrest by ICE for visa overstay and removal to the U.K.).  The conditions in ICE detention facilities are also typically worse than prisons, and the experience serves as another amplification to the punishment of incarceration based solely on Rob's citizenship.[24]

Philbrick's time served provides a perfect example of why Rob's sentencing should reflect the restrictions on his eligibility for sentence reduction.  Philbrick has a reduced sentence based on good time credit, completion of the Residential Drug Abuse Program ("RDAP"), and FSA time credits.[25]  As discussed above, Rob is not eligible for FSA time credits, and an ICE detainer could impact his ability to obtain time off for completion of RDAP, if he is even eligible.[26]  Philbrick is

---

80 (1st Cir. 2013) (noting that "moral turpitude" has never been defined by Congress and adopting the Board of Immigration Appeals' definition as including "thefts intended to permanently deprive the owner of the purloined property"); *Mejia-Rodriguez v. Holder*, 558 F.3d 46, 48-49 (1st Cir. 2009) (concluding that alien convicted of crimes which involved "proof of an intent to defraud" had committed a crime of "moral turpitude"); *Viveiros v. Holder*, 692 F.3d 1, 2 (1st Cir. 2012) (affirming inadmissibility of alien who pled guilty to a shoplifting charge which constituted a crime of "moral turpitude").

[24] A January 2019 DHS inspector general report on ICE detention contractors found "serious deficiencies such as significant understaffing, failure to provide sufficient mental health observation, and inadequate monitoring of detainees with criminal histories." *Conditions in Migrant Detention Centres*, AMERICAN OVERSIGHT (May 23, 2023), https://www.americanoversight.org/investigation/conditions-in-migrant-detention-centers. Reports of overcrowding, unsanitary conditions, staff shortages, and lack of basic facilities like heat have been persistent.  *See, e.g.*, *US migrant centres: Photos show 'dangerous' overcrowding*, BBC (Jul. 2, 2019), https://www.bbc.com/news/business-48842434; Eileen Sullivan, *A.C.L.U. Says Immigration Detention Facility Should Be Shut Down*, *NYT* (Sept. 22, 2022), https://www.nytimes.com/2022/09/22/us/politics/aclu-ice-immigration-detention.html; Camilo Montoya-Galvez, *Watchdog recommends relocation of detainees from ICE facility, citing unsanitary conditions and staff shortages*, CBS NEWS (Mar. 18, 2022), https://www.cbsnews.com/news/immigration-and-customs-enforcement-detention-center-watchdog-recommends-relocation-of-detainees/.

[25] Based on information provided by the BOP via the United States Attorney's Office.

[26] *Id.*

projected to be released from prison on December 31, 2024, and based on jail credit starting June 12, 2020, would serve only 54 months and two weeks of his 84-month sentence. *See* Exhibit C at 2. However, based on completion of RDAP, Philbrick is eligible for home detention starting July 3, 2024. *Id.* Assuming Philbrick will be released as scheduled to home detention on July 3, 2024, he will have served just 48 months and three weeks of his 84-month sentence. The government agrees that Rob deserves a lesser sentence than Philbrick, and Rob's lesser sentence should reflect the actual time Philbrick spent in confinement.

**b.  Rob Will Do Far Harder Time Than a U.S. Citizen Serving the Same Sentence**

In addition to affecting how much of an imposed sentence Rob will serve in jail, his status as a non-citizen also impacts the conditions under which he will serve any sentence. Inviolable BOP policy requires all non-U.S. citizens to serve any sentence in a low, medium or high security facility. *See* BOP Program Statement 5100.08 at 50 ("A male or female inmate who is not a citizen of the United States . . . shall be housed in at least a low security level institution"). Federal prison camps ("FPCs"), to which a U.S. offender like Rob would otherwise go, are unavailable to him. This means that Rob would do much harder time than a U.S. citizen convicted of the same crime:

- Whereas FPCs are fenceless, low security prisons are surrounded by two perimeter barriers, each reinforced by multiple coils of razor wire, gun towers, and armed patrols. Inside, low security prisons employ extensive video surveillance and tightly control inmates' lives through, among other things, a minimum of five daily "counts" (including a count during the middle of the night), random pat-downs, and strip-searches whenever they are removed from the facility for a visit or health appointment. These prisons also frequently undergo unpredictably long "lockdown" periods during which inmates are confined to quarters and denied recreation, visitation and telephone calls.

- Compared with FPCs that typically house 100 to 400 inmates, low security prisons usually have between 1,200 and 1,500 (and often exceed their designed maximum capacity). The overcrowding in

> low security prisons is extremely stressful for inmates and noise is
> constant.  The size of these institutions and the ratio of staff to
> inmates virtually guarantee unsafe and unsanitary conditions
> (leading to widespread infectious diseases and violence).

*See Conti*, ECF No. 229 at 21 (defense sentencing memorandum contrasting FPCs with low
security prisons).

Not only will the physical conditions in a low security facility serve as additional
punishment, but many inmates at low security prisons are serving lengthy sentences of 10 years or
more, have been convicted of violent crimes, are affiliated with gangs, and have a much higher
propensity for violence against other inmates. *See id.* at 22-23.  Prison in the United States would
also be excessively punishing for Rob because he would receive no visitors for lengthy periods.
His wife and one brother will fly to New York to attend the sentencing, but it is a significant burden
given the state of the family's finances, and will be impossible to take place with regularity.  This
will immeasurably amplify Rob's punishment, particularly with regard to his young daughters.

**7.      The Guidelines Range Should Be Considered and Then Disregarded**

Courts must <u>not</u> presume a Guidelines sentence is reasonable, but rather "make an
individualized assessment based on the facts presented." *Gall*, 552 U.S. at 39; *Pepper v. United
States*, 562 U.S. 476, 488 (2011) (courts must "ensure[] that the punishment will suit not merely
the offense but the individual defendant") (internal quotations and citation omitted).

Here, the parties not only agree on the calculation set forth in Rob's plea agreement, they
also agree that the range that calculation produces is inconsistent with just punishment. In such
circumstances, it is appropriate for the Section 3553(a) factors to drive sentencing.  *See Rita v.
United States*, 551 U.S. 338, 351 (2007) (district courts may find that the Guidelines fail to
"properly reflect the § 3553(a) considerations" or that "the case warrants a different sentence
regardless"); *United States v. Whigham*, 754 F. Supp. 2d 239, 252 (D. Mass. 2010) (below

Guideline sentence required where the range is greater than necessary); *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008) ("it is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance").

It also worth noting that in cases with large loss amounts such as this one, courts recognize that the Guidelines operate to skew sentences upward without underlying justification in the goals that drive sentencing. The loss amount here accounts for 24 of the 32 total offense levels. *See* Plea Agreement, ECF No. 84. This use of loss amounts as the most heavily-weighted variable in determining fraud sentences is "unusual" and "unknown to other sentencing systems," *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016), and the Sentencing Commission has never explained its "inordinate emphasis" or "why it is appropriate to accord such huge weight to [this] factor." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006). For this reason, district courts are permitted "to consider whether the significant effect of the loss enhancement . . . should result in a non-Guidelines sentence." *Algahaim*, 842 F.3d at 800; *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (a decision to issue a non-Guidelines sentence may "be based solely on policy considerations, including disagreements with the Guidelines").

Following this guidance, courts routinely criticize Section 2B1.1 for producing irrationally long sentencing ranges. In one particularly forceful recent instance, Judge Garaufis of the Eastern District of New York declared:

> As far as this Court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime. . . . Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less *solely* responsible for a white-collar offender's Guidelines sentence. . . . That this situation continues unabated is a great shame for the many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction.

*United States v. Johnson*, No. 16-CR-547-1, 2018 WL 1997975, at *3-*4 (E.D.N.Y. Apr. 27, 2018) (emphasis in original); *see also United States v. Watt*, 707 F. Supp. 2d 149, 151 (D. Mass. 2010) (undue focus on loss amount renders Guidelines of "no help").

Numerous judges and commentators have likewise observed that the unjustified impact of Section 2B1.1 is even more pronounced in cases, like this one, that involve high loss amounts. *See, e.g.*, *United States v. Corsey*, 723 F.3d 366, 378-79 & 380 (2d Cir. 2013) (Underhill, J., concurring) ("the loss guideline [is] fundamentally flawed, especially as loss amounts climb . . . [and] [t]he widespread perception that [it] is broken leaves district judges without meaningful guidance in high-loss cases. . . . The higher the loss amount, the more distorted is the guideline's advice to sentencing judges."); *United States v. Faibish*, 12-cr-265 (E.D.N.Y.), Sent'g Tr.,  ECF No. 271 at 23:1-12 (Mar. 10, 2016)  ("[T]he guidelines . . . are just mindlessly accelerated once you have numbers of any size added in the loss or gain table."); Frank O. Bowman, III, *Sentencing High-Loss Corporate Frauds After Booker*, 20 Fed. Sent'g Rep. 167, 168 (2008) (for defendants "convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines are now divorced from both the objectives of Section 3553(a) and, frankly, common sense").

The guidelines blunderbuss approach to loss also fails to accurately discern moral culpability in a given offense.  *See also Corsey*, 723 F.3d at 381 ("not all [] loss is equally serious," so its value as a proxy for culpability "must be carefully examined"); *Emmenegger*, 329 F. Supp. 2d at 428 (loss amount is "a relatively weak indicator of moral seriousness of the offense").  As Judge Underhill explained:

> A fraud that results in the loss of even a few thousand dollars by an
> elderly or sick person who, as a result of the loss, becomes unable
> to afford the necessities of life or medical care is much more serious
> than a fraud that results in ten or a hundred times that loss by a large
> corporation able to absorb the financial consequences . . . .  Simply

put, contrary to the assumption underlying the loss guideline, not all
dollars of loss are fungible.

*Corsey*, 723 F.3d at 381; *see also United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008)

(criticizing Guidelines for "apply[ing] without modulation to a wide range of conduct").

Where, as here, application of the loss enhancement generates a Guidelines sentence that does not approach a just result, the Court's sentencing determination should be guided by the factors set forth in 18 U.S.C. § 3553. *See, e.g., Adelson*, 441 F. Supp. 2d at 515 (where Guidelines calculation produces an overly long sentencing range, "a Court is forced to place greater reliance on the more general considerations set forth in Section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences."). As detailed herein, application of those factors, together with Rob's material attempt at cooperation, merit extraordinary leniency. The Guidelines range should therefore be considered as they must be, but then disregarded as wholly unfit to shed light on the appropriate punishment for this individual defendant given who he is and his role in this crime.

### 8. A Non-Incarceratory Sentence Would Not Create Unwarranted Disparities

Under 18 U.S.C. § 3553(a)(6) the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Rob's sentence cannot create unwarranted disparities with the sentences of similar defendants who have been found guilty of similar conduct because neither category exists. Rob's role in the case, and Rob, are entirely unique, for all of the reasons detailed herein and set forth in the letters of support submitted herewith. *See, e.g.*, *United States v. Desmond*, No. 05 CR 729-4, 2008 WL 686779, at *3 n.2 (N.D. Ill. Mar. 11, 2008) (noting that sentencing disparity considerations were inapplicable considering the particular situation of the defendant was "so unique that few other cases are likely to

be relevant for purposes of comparison"); *United States v. Roth*, No. 05 CR 792-5, 2008 WL 686783, at \*3 n.2 (N.D. Ill. Mar. 11, 2008) (same); *United States v. Villazan*, No. 05 CR 792-1, 2008 WL 686781, at \*2 n.1 (N.D. Ill. Mar. 11, 2008) (same); *cf. United States v. Moreno-Garcia*, 551 F. App'x 387 (9th Cir. 2014) (finding no plain error where district court considered and dismissed defendant's sentencing disparity arguments as his own situation was "unique"); *United States v. Sheppard*, 612 F. Supp. 194, 199 (S.D. Va. 1985) (dismissing defendant's sentencing disparity arguments because the case to which defendant cited to make his argument was "unique" and thus incomparable).

Further, many cases reflect extraordinary leniency where a non-custodial sentence constitutes the appropriate sentence tailored to the individual defendant and their role in the crime, even without cooperation. *E.g.*, *United States v. Kelly*, 16-cr-00837 (S.D.N.Y. Dec. 19, 2016) (varying from 97 to 121 months Guidelines range and imposing non-custodial sentence for non-cooperating defendant who pled guilty to bribing a New York pension fund official to personally earn $200,000 from ill-gotten business); *Prosperi*, 686 F.3d at 41, n.9, 50 (affirming variance from Guidelines range of 87-108 months' to non-custodial sentence for nine years long fraud scheme where defendants knowingly provided substandard concrete to "Big Dig" construction project and created false documentation to cover it up); *United States v. Panousos*, 17-cr-10227 (D. Mass.) (varying from 18 to 24 month Guidelines range and imposing non-custodial sentences on three defendants who pled guilty to $1.5 million cash-skimming tax fraud scheme that was motivated by "greed and a desire to cheat the government of the taxes they owed"); *United States v. Sales*, 17-cr-10110 (D. Mass.) (varying from 15 to 21 month Guidelines range and imposing non-custodial sentence on defendant who pled guilty to embezzling over $100,000 from an elderly bank customer which was used on personal expenses); *United States v. Harkonen*, 08-cr-00164 (N.D. Ca.) (varying from Guidelines range of 188 to 235 months and imposing non-custodial

sentence on defendant convicted at trial for misrepresenting the results of a drug trial and causing over $20 million in losses to over 250 vulnerable victims); *United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) (affirming variance from 57 to 71 months' Guidelines range to sentence of time served (one day) where defendant was convicted of defrauding the Small Business Administration of $1.7 million); *United States v. Kipnis*, 05-cr-00727 (N.D. Ill.) (varying from Guidelines range of 30 to 37 months and imposing non-custodial sentence following jury conviction of general counsel who defrauded his employer of $5.5 million); *United States v. Roth*, 2008 WL 686783, at *1-*3 (N.D. Ill. Mar. 11, 2008) (varying from Guidelines range of 63 to 78 months and imposing non-custodial sentence on former in-house counsel who pled guilty to making false statements to the FBI and participating in scheme to defraud a hospital of $14.7 million).

## **CONCLUSION**

████████████████████████████████████████████

████████████████████████████████████████  He has been severely punished already and, for the reasons discussed herein, we respectfully submit that given his personal history and secondary role in the offense, adding an incarceratory sentence of any length would be "greater than necessary to serve the purposes of sentencing," *Gall*, 552 U.S. at 44, counterproductive, and needlessly harmful to Rob's children.  We respectfully propose a lengthy period of home confinement in concert with community service.  *See Mullings*, 131 F. Supp. 3d at 4 ("In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society and our economy, justifiable parsimony in incarceration is prized.").

Rob's mother's letter signed off with a prayer for the Court: "May you be blessed with superhuman wisdom."  We join her, and request Your Honor grant Rob extraordinary leniency, but leniency that is justified.  Leniency that is just.

Dated:  September 10, 2023
       London, England

Respectfully submitted,

/s/ Roger A. Burlingame
Roger A. Burlingame
David N. Kelley
**DECHERT LLP**
160 Queen Victoria Street
London, UK EC4V 4QQ
P: +44 (0) 20 7184 7000
F: +44 (0) 20 7184 7001

*Attorneys for Defendant Robert Newland*