UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA        :

   -*v.*-                     :         S1 20 Cr. 351 (SHS)

ROBERT GEOFFREY NEWLAND,       :

               Defendant.      :

---------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Cecilia Vogel
Jessica Feinstein
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................. 2

    A.   PHILBRICK AND NEWLAND'S FRAUD SCHEME ............................................... 2

        1.   *Philbrick's Loan Contract with Athena Art Finance* ................................ 7

        2.   *Jean-Michel Basquiat's "Humidity"* ......................................................... 7

        3.   *Christopher Wool's "Untitled" (2010)* .................................................... 10

        4.   *Fraud on Jay Jopling* ............................................................................. 12

    B.   PHILBRICK AND NEWLAND'S SCHEME UNRAVELS AND CRIMINAL CHARGES ARE BROUGHT ...................................................................................................... 14

    C.   THE GUIDELINES CALCULATION AND PROBATION'S RECOMMENDATION ...... 15

    D.   Forfeiture and Restitution ............................................................................ 16

DISCUSSION ................................................................................................... 17

    A.   A MEANINGFUL TERM OF IMPRISONMENT IS WARRANTED ........................... 17

        1.   *The Nature and Seriousness of the Offense and the Need for Just Punishment Call for a Significant Prison Term* ............................................... 18

        2.   *The Defendant's Sophistication and Financial Expertise Warrant a Meaningful Term of Imprisonment* .............................................................. 21

        3.   *The Sentence Imposed Should Reflect the Need for General Deterrence of Fraud in the Art Market* .......................................................................... 22

CONCLUSION .................................................................................................. 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA                 :

   *-v.-*                                          :         S1 20 Cr. 351 (SHS)

ROBERT GEOFFREY NEWLAND,                  :

               Defendant.     :

-----------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Robert Newland is scheduled to be sentenced on September 20, 2023, at 2:30 p.m.  The Government respectfully submits this memorandum in connection with that sentencing and in response to the defendant's sentencing memorandum (Dkt. No. 104) ("Def. Mem.").

## PRELIMINARY STATEMENT

The defendant participated with Inigo Philbrick in perpetrating one of the most significant frauds in the art market in history. In the role of financial adviser, the defendant partnered with Philbrick, a talented young art dealer, to convince investors and lenders to trust Philbrick with their art and money. In fact, lies permeated nearly every aspect of Philbrick's business, which ultimately grew into a Ponzi-like scheme premised on fractional art investments and fraudulently obtain loans.

Philbrick, not the defendant, was the instigator and driver of the scheme, but the defendant played a significant role that ultimately allowed the scheme to continue longer and to generate greater losses to victims. The defendant used his financial expertise and credentials to give credibility to Philbrick's art business, thereby encouraging certain investors and lenders to invest with Philbrick. The defendant also used his financial expertise to extend the life of the

fraud by strategizing how to maximize profits in order to prioritize paying back certain victims without disclosing the fraud. Although the defendant was not privy to all of Philbrick's lies, the defendant knowingly lied to certain victims on Philbrick's behalf and, in other instances, helped Philbrick craft the lies that Philbrick then passed along to victims. With the defendant's help, over a four-year period, Philbrick engaged in over $86 million in fraudulent art deals that resulted in millions in losses to victims. The defendant participated in approximately half of those transactions over a two-year period. Many of the victims will likely never recover their lost assets.

Recognizing that Philbrick, not the defendant, was the leader of the scheme, and recognizing the defendant's acceptance of responsibility, as expressed by his prompt guilty plea and in his letter to the Court, the Government seeks a sentence that is below both the Sentencing Guidelines range of 121 to 151 months' imprisonment and Philbrick's sentence of 84 months' imprisonment. Nevertheless, the Government recommends a meaningful term of imprisonment that appropriately reflects the extensive harm the defendant caused, the defendant's impactful role in the scheme, and the need for general deterrence in the unregulated art market.

## BACKGROUND

### A.    Philbrick and Newland's Fraud Scheme

As set forth in the Presentence Investigation Report (the "PSR"), from 2016 through 2019, Inigo Philbrick engaged in an extensive scheme to defraud art collectors, investors, and lenders in the art market (the "Fraud Scheme"). (PSR ¶ 10). The defendant, Robert Newland, was Philbrick's financial advisor and had a key role in perpetrating the Fraud Scheme. As part of the Fraud Scheme, Philbrick made material misrepresentations and omissions regarding the ownership and provenance of artworks in order to access valuable art and obtain sales proceeds, funding, and loans.  (*Id.*).  Philbrick also furnished fraudulent contracts to artificially inflate the

value of certain artworks and to conceal his scheme, including a contract that listed a stolen identity as the seller, and a consignment agreement that forged the signature of an auction house employee.  (*Id.*). The defendant facilitated a number of Philbrick's fraudulent transactions, including by strategizing with Philbrick and making material misrepresentations to certain victim investors and lenders.  (PSR ¶11).

Inigo Philbrick was an art dealer specializing in post-war and contemporary visual art. (PSR ¶ 10). His eponymous business Inigo Philbrick, Ltd. ("IPL") had galleries in London and Miami. (*Id.*). Although some of Philbrick's clients were collectors seeking to purchase art for their possession and enjoyment, his business was primarily the sale of artworks or percentage ownership of artworks as financial investments, with the idea that Philbrick would help the investors resell the artworks shortly after purchase. Often, the physical artworks would remain in Philbrick's storage facilities even after sale to investors so that Philbrick could have access to the artworks as he tried to resell them for a profit.

Robert Newland, the defendant, worked as a financial advisor to Philbrick's art business. (PSR ¶ 11). Philbrick was the art expert, primarily selecting which artworks to buy and sell and interfacing with clients, while the defendant's role was chiefly to advise Philbrick regarding how to maximize profits, including how to financially leverage the business. (*See* PSR ¶ 15). The defendant had significant business and financial expertise by the time he began advising Philbrick. He had obtained a Bachelor of Science degree in management sciences from the London School of Economics and a master's degree in management sciences from Group Hautes Etudes Commerciales ("HEC") in Paris. (PSR ¶¶ 99-100). Prior to partnering with Philbrick, the defendant had worked as a management consultant at McKinsey & Company, as a consultant for

Christie's auction house, and as a commercial director for the prominent London-based White Cube Gallery ("White Cube"). (PSR ¶¶ 107, 108, 109).

Philbrick and the defendant met while they both worked for Jay Jopling, who operated White Cube. (PSR ¶ 12). While still working with Jopling in a joint venture, in 2014, Philbrick formed his own independent business, IPL. (*Id.*). That same year, the defendant began informally advising Philbrick on various financial aspects of IPL. (PSR ¶ 13). Over time, the defendant became more deeply involved in Philbrick's art business. In 2015, the defendant assisted Philbrick to obtain financing for IPL from one of Philbrick's clients, Fine Art Partners ("FAP"), a German-based company that later became a victim of the Fraud Scheme; Newland also invested in several art deals with Philbrick involving FAP. (*Id.*). In 2016, the defendant advised Philbrick regarding the finances of various art deals and continued to invest in FAP deals. (*Id.*). In 2017, the defendant formally left White Cube, opened his own art consulting business, Arcora Advisory, and began working even more closely with Philbrick. (*Id.*). For example, a promotional pamphlet for Philbrick's art business from 2018 listed the defendant as the "Commercial Director." (*Id.*). Once the defendant officially joined forces with Philbrick in 2017, he began participating in the Fraud Scheme.

Through its investigation, the Government has identified 29 artworks that Philbrick used to conduct fraudulent art deals in furtherance of the Fraud Scheme, resulting in $86.43 million in fraudulently obtained transactions and losses to victims.  (PSR ¶ 14). The $86.43 million represents payments that victims sent to Philbrick based on his fraudulent misrepresentations.[1]

---

[1] The $86.43 million does not reflect losses premised on estimations or appraisals of the market value of artworks, and it does not reflect contractual or pre-judgment interest owed to victims or legal fees paid by victims due to the Fraud Scheme. As discussed below, the Government has submitted a proposed restitution order requiring the defendant to pay restitution in the amount of $67,489, 808, reflecting payments made by victims in fraudulent transactions that the defendant

The defendant participated in or had knowledge of approximately half of these fraudulent art deals. (*Id.*). The Government has not otherwise identified evidence showing the defendant participated in or had knowledge of Philbrick's other fraudulent art deals.

The degree of the defendant's participation in each of the fraudulent art deals varied. (PSR ¶ 15). The defendant served as a significant direct point of contact for two victims, FAP and Athena Art Finance Corp. ("Athena"), a company based in Manhattan, New York that specializes in providing loans secured by art pledged as collateral, and the defendant knowingly either provided false information to them or failed to disclose to them competing ownership interests in artworks. (PSR ¶ 17). The defendant drafted many emails on Philbrick's behalf to victim-investors or financiers, which Philbrick then emailed, including emails from a fictitious character, "Martin Herrero", to Jopling in furtherance of the Fraud Scheme. (PSR ¶¶ 16-17).

Generally, the defendant advised Philbrick regarding strategy—such as what to say to victim investors and financiers to keep them at bay until Philbrick could find the funds to pay them, as well as how to maximize returns on artworks to pay investors without disclosing the Fraud Scheme. (PSR ¶ 15). The defendant maintained detailed spreadsheets tracking which artworks were over 100% committed to investors and financiers and analyzing what profits would be necessary to satisfy IPL's obligations to the investors and financiers. (PSR ¶ 16). These spreadsheets maintained by the defendant listed specific artworks, the percentages of each artwork owned by various investors and financiers, misrepresentations made to investors and financiers regarding the purchase and sales prices of the artworks, and projections on profits and risks for each artwork. (*Id.*). The spreadsheets showed that Philbrick had sold more than 100% of the value of certain artworks to various investors, without the investors' knowledge. (*Id.*). The

---

knew of or participated in, as well as other expenses incurred by victims in connection with those transactions recoverable as part of restitution.

defendant was also a primary point of contact for IPL's accountants and coordinated with Philbrick to provide false information to the accountants regarding various art deals to hide the Fraud Scheme from the accountants. (*Id.*).

Philbrick used the proceeds of the Fraud Scheme both to fund his business and a lavish lifestyle. (PSR ¶ 46). Specifically, Philbrick used the fraud proceeds to pay off investors and lenders and to purchase new artwork to further the Fraud Scheme. (*Id.*). Philbrick also paid for expensive vacations, hotels, restaurants, wine, watches, and furniture using his crime proceeds. (*Id.*). In contrast, the defendant did not have control over IPL's bank accounts, nor did the defendant receive payments from victims directly. Compared with Philbrick, the defendant's profits from the Fraud Scheme were limited. (PSR ¶ 47). Initially, the defendant was to receive a percentage of the quarterly operating profits of IPL in exchange for his advisory services, but the defendant and Philbrick never went forward with the agreement, and Philbrick failed to pay the defendant on any consistent basis. (*Id.*). Ultimately, Philbrick paid the defendant on an *ad hoc* basis consisting of a combination of financial payments and artworks, which represented not only payment for the defendant's advisory services, but also profits from the defendant's investment in art deals involving FAP and repayment of the defendant's loan to Philbrick. (*Id.*). As discussed below, the defendant has agreed to forfeit $76,000 in cash, three artworks, and a desk, which he received as payment from Philbrick over the course of the Fraud Scheme. (PSR ¶ 48). At the time of payment, Philbrick valued the artworks and desk at over $500,000, but the U.S. Marshals have recently obtained an independent appraisal providing a fair market value of approximately $370,000 for these items. (*Id.*).

The following are examples of fraudulent transactions that the defendant perpetrated with Philbrick as part of the Fraud Scheme.

*1. Philbrick's Loan Contract with Athena Art Finance*

Starting in approximately 2016, Philbrick began to obtain loans from Athena, which specializes in providing loans secured by art pledged as collateral. (PSR ¶ 18). In January 2017, Philbrick introduced the defendant to Athena as his financial advisor, and the defendant thereafter was a key participant in negotiations with Athena on Philbrick's behalf. (*Id.*). On March 31, 2017, Philbrick, operating through a shell company incorporated in the Bailiwick of Jersey named 18 Boxwood Green ("18 Boxwood"), entered into a loan and security agreement with Athena (the "Loan Contract") for a $10 million revolving loan secured by a rotating pool of artworks approved by Athena (the "Collateral Pool").  (PSR ¶ 19). The loan amount was later increased to $13.5 million.  (*Id.*).

To obtain financing for his business, Philbrick and the defendant defrauded Athena by misrepresenting Philbrick's ownership interest in various artworks in the Collateral Pool. (PSR ¶ 19). As further described below, Philbrick pledged artworks as collateral which he had already sold portions of to third parties, and then Philbrick and the defendant made false representations to Athena that Philbrick (through the shell company) was the sole owner of those artworks. (*Id.*). Multiple artworks were fraudulently included in the Collateral Pool, but two examples are described below.

*2. Jean-Michel Basquiat's "Humidity"*

Philbrick and the defendant defrauded Athena and two investors in connection with a 1982 painting by Jean-Michel Basquiat titled "Humidity" (the "Basquiat"). (PSR ¶ 20). In summary, Philbrick induced art investor Alexander Pesko ("Pesko") and gallerist Damian Delahunty ("Delahunty") to make substantial payments for the Basquiat based on fraudulent contracts and misrepresentations regarding the Basquiat's ownership. Subsequently, Philbrick

pledged the Basquiat as part of the Athena Collateral Pool, in the process lying to Athena that the defendant had clear title to the Basquiat.  (PSR ¶¶ 21-25). At the time the Basquiat was pledged as collateral to Athena, the defendant knew about Pesko and Delahunty's ownership interests in the Basquiat, and the defendant participated in the lies to Athena. (PSR ¶ 25).

First, in August 2016, Philbrick entered into an agreement with Pesko, who was acting on behalf of Satfinance Investment Ltd. ("Satfinance"), to jointly purchase the Basquiat. (PSR ¶ 21). During negotiations with Pesko, Philbrick provided Pesko with a fraudulent contract purporting to show that the defendant had agreed to purchase the Basquiat from SKH Management Corp. ("SKH") for $18.4 million. (PSR ¶¶ 21-22). The contract for the sale of the Basquiat was purportedly signed by an officer of SKH. (PSR ¶ 22). In fact, the contract was false. Neither SKH nor the signing officer had previously owned the Basquiat, which had actually been purchased by Philbrick in a private sale through an auction house for $12.5 million. (*Id.*). Pesko paid Philbrick 50 percent of the purported $18.4 million purchase price of the Basquiat and also provided a $3 million loan to IPL secured by the Basquiat. (PSR ¶ 21). The Government does not have evidence of the defendant's participation in Philbrick's transaction with Pesko regarding the Basquiat, although, as described below, the defendant later became aware of Pesko's ownership interest and worked with Philbrick to encumber Pesko's interest by pledging the Basquiat to Athena as part of the Collateral Pool. (PSR ¶ 22).

Next, in November 2016, Philbrick sold a 12.5 percent ownership stake in the Basquiat to Delahunty for a total of $2.75 million. (PSR ¶ 23). Philbrick falsely told Delahunty that Philbrick was purchasing the Basquiat from SKH for $22 million, and Philbrick provided Delahunty with an unsigned contract purporting to show the sale from SKH to Philbrick. (PSR ¶¶ 23-24). Philbrick did not tell Delahunty about Satfinance's ownership interest in the Basquiat, and

likewise did not disclose to Pesko the sale to Delahunty. (PSR ¶ 24). Again, the Government does not have evidence of the defendant's participation in Philbrick's transaction with Delahunty regarding the Basquiat, although, as described below, the defendant later became aware of Delahunty's ownership interest and worked with Philbrick to encumber Delahunty's interest by pledging the Basquiat to Athena as part of the Collateral Pool. (PSR ¶ 22).

In March 2017, after Philbrick had sold percentage ownerships of the Basquiat to Satfinance and Delahunty (and encumbered it with a $3 million loan), Philbrick sought to pledge the Basquiat to the Collateral Pool. (PSR ¶ 25).  In the process, Philbrick and the defendant falsely represented to Athena that Philbrick was the sole owner of the Basquiat and did not disclose the interests of Satfinance or Delahunty. (*Id.*). Specifically, the defendant was on the email communications between Philbrick and Athena in which Philbrick falsely represented that he was the sole owner of the Basquiat, and the defendant knew at the time that Pesko and Delahunty had ownership interests in the Basquiat. (*Id.*). The defendant, moreover, knowingly emailed Athena false provenance information for the Basquiat to make it appear that Philbrick was the sole owner. (PSR ¶ 26). The defendant further emailed Athena records of the title transfer from IPL to 18 Boxwood, despite knowing that Philbrick could not transfer full title of the Basquiat because Pesko and Delahunty each had ownership interests in the Basquiat. (*Id.*). On April 7, 2017, Athena approved adding the Basquiat to the Collateral Pool, and provided Philbrick with an additional $3.25 million in financing as a result. (PSR ¶ 26). Pursuant to the Loan Contract, Philbrick provided Athena with physical possession of the Basquiat.

By assisting Philbrick to pledge the Basquiat as collateral for Athena based on false pretenses, the defendant not only defrauded Athena but also knowingly fraudulently encumbered Pesko and Delahunty's interests in the Basquiat. Going forward, the defendant strategized with

Philbrick regarding how to handle the competing claims without disclosing the Fraud Scheme. To do so, the defendant listed the Basquiat on his spreadsheet that tracked the various competing ownership interests in artworks. (PSR ¶ 27). The defendant noted that the risk to Philbrick from the Basquiat was "high" and analyzed the impact of a possible sale of the Basquiat at different price points and whether Philbrick would be able to pay back all the Basquiat investors. (*Id.*). Different versions of the spreadsheet show that, over time, Philbrick and the defendant sought to formulate a strategy regarding how to handle the competing interests of Delahunty, Pesko, and Athena in the Basquiat. (*Id.*).

Athena maintained custody of the Basquiat after the Fraud Scheme unraveled, and Athena, Satfinance, and Delahunty are currently locked in litigation over ownership of the Basquiat.

### 3. Christopher Wool's "Untitled" (2010)

Philbrick and the defendant made material misrepresentations and omissions to investors and Athena about the ownership of an untitled 2010 painting by Christopher Wool (the "Wool"). (PSR ¶ 28).

On June 25, 2018, Philbrick contracted with FAP to purchase the Wool on behalf of FAP for $6.9 million and then sell the Wool on FAP's behalf. (PSR ¶ 29). By this time, Philbrick and FAP had been engaging in transactions for several years. The defendant had initially introduced FAP to Philbrick and brokered the relationship. As the principal point of contact for FAP, the defendant participated in negotiations with FAP for the purchase of the Wool. (*Id.*). During the negotiations, Philbrick did not disclose to FAP that IPL had already purchased the Wool for only $4.175 million in April 2018 and instead led FAP to believe that IPL would buy the Wool from a third-party on behalf of FAP for $6.9 million. (*Id.*). Philbrick copied the defendant on these

emails with FAP in which Philbrick provided this false information, and although the defendant knew at the time that the information was false and IPL was the actual owner of the Wool, the defendant did not correct the information. (*Id.*). Instead, the defendant sent a sales contract for the Wool to FAP to execute the fraudulent transaction. (*Id.*).

Philbrick and the defendant continued the fraud involving the Wool by selling it to others. On July 11, 2018, Philbrick sold three ownership shares in the Wool, totaling 80 percent ownership of the Wool, to three other investors for $1.2 million each. (PSR ¶ 30). The combined ownership interests of the three investors and FAP totaled more than 100% of the Wool. (PSR ¶ 31). The defendant knew the Wool would be over 100% encumbered but nevertheless emailed invoices to the three investors and coordinated with them to settle their payments for the Wool. (*Id.*). Philbrick and the defendant did not disclose the sale of those ownership shares to FAP, and they did not disclose FAP's ownership interest to the other three investors. (PSR ¶ 30). Like the other artworks, the defendant tracked the Wool in his spreadsheet, noting that the Wool was purchased for less than what Philbrick had represented to FAP, that the three investors and FAP's claims to the artworks were more than the artwork was worth, and that the risk to this artwork was "high" and it was "going to be a massive hole." (PSR ¶ 31).

In September 2018, the defendant then sought to add the Wool to the Collateral Pool on Philbrick's behalf. (PSR ¶ 32). In the process, the defendant represented to Athena over the course of several communications that Philbrick was the sole owner of the Wool and provided a false provenance for the Wool that omitted the transactions with FAP and the other three investors. (*Id.*). In October 2018, Philbrick transferred title of the Wool to 18 Boxwood, and Athena approved the Wool as an addition to the Collateral Pool and provided Philbrick with an additional $1.75 million in financing. (*Id.*). Neither Philbrick nor the defendant disclosed to FAP

or the other three investors that the Wool had been pledged as collateral for financing from Athena.

### 4. Fraud on Jay Jopling

Philbrick and the defendant defrauded Jay Jopling, for whom they had both worked and with whom Philbrick participated in various joint ventures. (PSR ¶ 33). As detailed below, Philbrick invented a fictitious art buyer to delay paying a debt owed to Jopling for jointly owned artworks, and the defendant assisted Philbrick to execute the fraud principally by drafting emails from the fictitious buyer on Philbrick's behalf.

In 2015, Philbrick and Jopling's joint venture, Philbrick Ltd. (a different entity than IPL), purchased an untitled 2009 painting by artist Christopher Wool, referred to as "P604," for $3.5 million. (PSR ¶ 34). Jopling provided the financial backing for Philbrick Ltd. Philbrick sold two-thirds of P604 to investors. (*Id.*). In December 2016, Philbrick told Jopling that he had sold Philbrick Ltd.'s remaining one-third interest in P604, along with 50 percent of a painting by artist Wade Guyton (owned by Jopling's entity Modern Collections), to an undisclosed purchaser (the "Client") for approximately $3.5 million. (*Id.*). Philbrick did not provide Jopling with the proceeds from the sale.

In August 2017, Jopling had become frustrated that Philbrick had failed to sell their jointly owned artworks and, in particular, had failed to repay him for the sale of P604 and the Guyton (together, "P604/Guyton"). (PSR ¶ 35). Philbrick falsely told Jopling that the Client had a legal issue that was delaying the payment. (*Id.*). As Jopling continued to insistent on information, the defendant advised Philbrick regarding how to respond to Jopling, including by drafting emails to Jopling on Philbrick's behalf that Philbrick then sent to Jopling. (PSR ¶ 36). Philbrick and the defendant's email correspondence shows that the defendant was aware that

Philbrick had provided Jopling with a false narrative regarding the Client and strategized with Philbrick regarding whether to lie to Jopling about the location of P604/Guyton. (*Id.*). Philbrick later disclosed the storage location of the P604/Guyton but lied that the Client refused to release the artwork to Jopling. (PSR ¶ 37). In reality, a few months, before in June 2017, Philbrick had sold P604 to an investor as part of a $6 million sale buy-back agreement that included other artworks, and the other investor had custody of P604. (PSR ¶ 41). The defendant was aware of the sale buy-back agreement and strategized with Philbrick regarding how to handle the risk that the other investor could learn of Jopling's claims to the artwork if they disclosed the storage location to Jopling. (PSR ¶ 37).

Facing pressure from Jopling to disclose the Client and make payment, in 2017, Philbrick invented a fake name and fake email account for the Client. (PSR ¶ 38). Philbrick told Jopling that the Client was the "Argentine financier Martin Herrero," a purported relative of Philbrick's then-girlfriend Francisca Mancini ("Mancini"). (*Id.*). Philbrick provided Jopling with a bill of sale reflecting that P604/Guyton were sold to Fine Artworks, Ltd. ("FAW") for $4.5 million, presenting it as Herrero's company. (*Id.*). In fact, Martin Herrero is a fictional person, and FAW was an entity controlled by Philbrick, whose ultimate beneficial owner was Mancini. (*Id.*).

Over the course of a year, from 2017 to 2018, Philbrick and the defendant used the email account "martinherrero1810@gmail.com" to send emails to Jopling pretending to be Herrero and providing Jopling with a variety of excuses as to why payment to Jopling was delayed. (PSR ¶ 39). On multiple occasions, the defendant drafted emails for Philbrick pretending they were from Herrero, fabricating various false pretexts and roadblocks, for the purpose of continuing to delay payment to Jopling and hide the truth from Jopling, and Philbrick sent the emails to Jopling. (PSR ¶¶ 39-40).

At some point, Philbrick bought back P604 for $2 million in connection with the sale buy-back agreement.  In April 2018, Philbrick sold 25% of P604 to Pesko on behalf of Satfinance for $3 million. (PSR ¶ 41). Philbrick falsely represented to Pesko that Philbrick and Satfinance were the only owners of P604. (*Id.*). In March 2019, Philbrick gave Pesko physical custody of P604. (*Id.*).

Philbrick never fully repaid Jopling for P604/Guyton, ultimately owing him approximately $1.95 million. (PSR ¶ 42).

### B.    Philbrick and Newland's Scheme Unravels and Criminal Charges Are Brought

In late 2018, the defendant began working for another art gallery. (PSR ¶ 43). The defendant continued to participate in the Fraud Scheme, but his involvement decreased. (*Id.*). Going forward, the defendant's role in the Fraud Scheme was primarily to assist Philbrick in managing the relationship with FAP.

By the fall of 2019, the Fraud Scheme began to come to light. (PSR ¶ 43).  By this time, various art deals had not gone well, and Philbrick was no longer able to pay Athena or his investors. (*Id.*). In other words, Philbrick's pseudo-Ponzi scheme collapsed. Various investors became suspicious given Philbrick's delay delivering payments and his increasingly eccentric explanations for the delayed payments, and investors began making increasing demands to physically secure artworks, obtain documentation, and receive payment. Faced with the collapsing Fraud Scheme, in early October 2019, Philbrick made admissions to a few investors and Athena, disclosing portions of the Fraud Scheme, while keeping other investors in the dark. (*Id.*). The defendant did not participate in these conversations, (*id.*), with the exception that in September 2019, during a meeting with FAP in which FAP sought confirmation that Philbrick's business was operating normally, the defendant lied and did not disclose the Fraud Scheme to FAP.

By November 2019, various victims had filed civil lawsuits in multiple jurisdictions against Philbrick in connection with the Fraud Scheme. (PSR ¶ 44). At the same time, Philbrick shuttered his galleries in Miami and London, stopped communicating with his investors, failed to respond to legal proceedings, and fled to the Republic of Vanuatu. (PSR ¶¶ 44-45). The defendant had no role in, or prior knowledge of, Philbrick's flight to Vanuatu. (PSR ¶ 45).

On June 12, 2020, Philbrick was taken into the custody of the U.S. Marshals with the assistance of authorities in Vanuatu, and he was brought to this District in custody to face charges. On July 13, 2020, a grand jury in this District returned an indictment charging Philbrick with wire fraud and aggravated identity theft. On November 18, 2021, Philbrick pled guilty to wire fraud, and on May 5, 2022, the Court sentenced him to 84 months' imprisonment.

The defendant continued to reside in the United Kingdom after Philbrick fled to Vanuatu and after Philbrick's arrest and guilty plea. On March 8, 2021, a grand jury in this District returned a sealed indictment charging the defendant with conspiracy to commit wire fraud and wire fraud. On February 23, 2022, the defendant was arrested in the United Kingdom. (PSR ¶ 50). On September 22, 2022, the defendant was extradited to the United States, on consent, and he pled guilty to conspiracy to commit wire fraud pursuant to a plea agreement at his initial appearance on September 23, 2022. (PSR ¶¶ 5, 50). The defendant has remained released on bail since his arrest and extradition.

## C.    The Guidelines Calculation and Probation's Recommendation

The Probation Office calculates the defendant's advisory Guidelines range, as follows, consistent with the stipulated Guidelines range in the plea agreement:

- In this case, involving a violation of 18 U.S.C. § 1343, the offense is governed by U.S.S.G. § 2B1.1.  (PSR ¶ 59).

15

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level for the offense is 7, because the statutory maximum term of imprisonment is 20 years or more.  (*Id.*)

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(M), because the offense involved a loss that exceeded $65,000,000, but did not exceed $150,000,000, the base offense level is increased by 24 levels.  (PSR ¶ 60).

- Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involved 10 or more victims, the offense level is increased by 2 levels.  (PSR ¶ 61).

- Pursuant to U.S.S.G. § 2B1.1(b)(1), because the defendant committed a substantial portion of the scheme from outside the United States, and the offense otherwise involved sophisticated means, the offense level is increase by 2 levels.  (PSR ¶ 62).

- Pursuant to U.S.S.G. § 3E1.1(a), the offense level is decreased by two levels, because the defendant demonstrated acceptance of responsibility for the offense.  (PSR ¶ 68).

- Pursuant to U.S.S.G. § 3E1.1(b), the offense level is decreased by one additional level, because the defendant timely notified authorities of the intention to enter a plea of guilty. (PSR ¶ 69).

In accordance with the above, the total offense level is 32.  (PSR ¶ 70).  The defendant has no known prior convictions, so his Criminal History Category is I.  (PSR ¶ 73).  Based upon these calculations, the defendant's advisory Guidelines range is 121-151 months' imprisonment. (PSR ¶ 119).

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), the Probation Office recommends a below-Guidelines sentence of 60 months' imprisonment. (PSR pp. 34-35).

### D.   Forfeiture and Restitution

The Court must order forfeiture and restitution.  In connection with the defendant's plea, the Court has already entered a consent preliminary order of forfeiture in the amount of $76,000 and for the following specific property, representing the payments the defendant received from the Fraud Scheme: (a) *Personal Distance A*, painting by Carroll Dunham, 96.5 x 124.5 cm (49 x 38 in.); (b) *Untitled* 2016 painting, oil and etching on paper, by Christopher Wool, image size 19 x 15 cm (7.5 x 6 in), paper size 41.3 x 35.6 cm. (16.24 x 14 in.); (c) *Untitled* 2007 print, Epson

UltraChrome inkjet on linen, by Wade Guyton, 213.36 x 175.26 cm. (83.21 x 68.35 in.); and (d) a Jean Prouvé desk H 72 x L 160 x P 71.5 cm. The Court should include forfeiture in this amount and for this specific property as part of the judgment at sentencing.

As part of the plea agreement, the defendant agreed to pay restitution in an amount ordered by the Court. The Government includes with this submission a proposed restitution order, to which the defendant consents. The Government seeks restitution in the amount of $67,489,808 on behalf of twelve victims. The Government determined restitution based on claims submitted by victims as well as other evidence collected during the investigation. The restitution amount is lower than the restitution amount ordered as to Philbrick because restitution is limited to the fraudulent transactions which the Government can prove were reasonably foreseeable to the defendant, and the defendant did not participate in or have knowledge of all Philbrick's fraudulent transactions.

As indicated in the PSR, consistent with the Government's investigation to date, the defendant does not at present appear to have assets sufficient to pay restitution. Although the defendant did not substantially profit from the Fraud Scheme, Philbrick and the defendant have left it up to their victims to fight amongst themselves to unravel the fraudulent art deals and recover their losses. Many civil lawsuits filed by victims in various jurisdictions are pending to resolve disputed ownership claims over multiple artworks. The Government expects that many victims, unfortunately, will never be made whole.

## DISCUSSION

### A.     A Meaningful Term of Imprisonment Is Warranted

For the reasons discussed below, the factors set forth in 18 U.S.C. § 3553(a) weigh strongly in favor of a meaningful term of imprisonment. The Government acknowledges that

there are mitigating factors in this case that the Court should consider, and for this reason, the Government recommends a below-Guidelines sentence that is less than Philbrick's sentence of imprisonment. In particular, Philbrick, not the defendant initiated and drove the Fraud Scheme; the defendant did not know about all aspects of the Fraud Scheme; the defendant's profits from the Fraud Scheme were limited; and the defendant has expressed remorse and accepted responsibility. Nevertheless, a meaningful term of imprisonment is warranted to satisfy the factors of Section 3553(a).

> 1. *The Nature and Seriousness of the Offense and the Need for Just Punishment Call for a Significant Prison Term*

The nature and seriousness of the offense, and the need for the sentence imposed to provide just punishment, warrant a significant sentence. *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). As outlined at some length above, the defendant helped execute an extensive and brazen fraud. The defendant's involvement in the Fraud Scheme was extensive and lengthy. During a more than two-year period, the defendant helped Philbrick scam twelve victims, ranging from individual art collectors to well-established gallerists, investors, and lenders. Philbrick and the defendant were not equal partners in the Fraud Scheme, but they worked as a team. Philbrick deployed his charm and deep knowledge of the art market to induce his victims to purchase stakes in artworks and lend him money. The defendant, meanwhile, used his business credentials to lend Philbrick's business credibility and legitimacy, thereby inducing victims to invest with and loan money to Philbrick's business. The defendant also deployed his business acumen to act a strategist for Philbrick in furtherance of the Fraud Scheme. He advised Philbrick regarding how to manage relationships with certain victims and created financial models to evaluate how to expand profits and prioritize payments, all for the purpose of keeping the "house of cards" afloat to prevent disclosing the Fraud Scheme. To persuade their victims to invest in artworks or loan Philbrick

money, Philbrick and the defendant at times provided victims with fake invoices and records to corroborate their misrepresentations regarding the ownership and purchase history of the artworks. The audacity of Philbrick and the defendant's fraud is epitomized by the invention of "Martin Herrero"—an entirely fictional person (with an entirely fictional email address) invented only to avoid paying their erstwhile employer Jay Jopling. Although the defendant did not initially invent the identity, he wholeheartedly embraced the ploy by drafting numerous emails for Philbrick as "Martin Herrero."

The defendant's participation in the Fraud Scheme was extensive with respect to the number of victims, the number of artworks, the length of time—and the loss amount. Losses from the Fraud Scheme overall topped $86 million. The defendant specifically participated in or had knowledge of fraudulent transactions entailing losses of over $60 million. The loss amount is so large in part because of the defendant's involvement in the Fraud Scheme. For example, the defendant had a key role in obtaining additional financing from Athena and FAP that allowed the Fraud Scheme to continue longer than it may otherwise have. In addition, the complex nature of many of the transactions made it difficult for the Government and victims to uncover the extent of his crime. Victims have been left to try to untangle the mess through civil litigation over artworks with competing claims, and in the process have had to spend even more money on legal fees. Much of this litigation involves victims having to fight against one another to make up their losses. This constitutes an additional layer of harm that the Court should be cognizant of in imposing sentence. And while the Government is seeking forfeiture and restitution, neither the defendant nor Philbrick have the assets to pay any significant portion of the restitution owed, so that many victims will never be made whole. The defendant's participation in causing the extensive and irreparable damage calls for a meaningful term of imprisonment.

One poignant example of the harm the defendant caused is set forth in the Victim Impact Statement of Daniel Tümpel, the owner of FAP, attached hereto as Exhibit A. Mr. Tümpel describes the defendant's central role in luring FAP to invest with Philbrick and to continue investing, ultimately increasing FAP's losses. Mr. Tümpel describes how the defendant's business background and friendship caused Mr. Tümpel to trust the defendant and Philbrick, and how the defendant subsequently abused that trust by defrauding FAP in connection with multiple artworks, feeding Mr. Tümpel a series of lies, all the way until the collapse of the Fraud Scheme in the fall of 2019. Mr. Tümpel describes the defendant's deceit and how the defendant's willingness to partner with Philbrick to engage in fraud increased the harm caused by their Fraud Scheme:

> Newland could – and should – have walked out on Philbrick the moment he found out about Philbrick's fraudulent activities. He could – and should – have informed and warned us. That very moment, without hesitation. He would have spared us endless court cases and millions of dollars of losses. He would have had to take his loss, but he would have kept his honor and spared his children and family the shame of what they now have to go through. But Newland choose not to do that. Instead, he crossed the line over to the dark side and became a fraudster and a criminal.

The defendant and Philbrick's fraud has put Mr. Tümpel and his family through "an incredible amount of emotional and financial horror." Mr. Tümpel recounts that the fallout from the Fraud Scheme has been "traumatizing and pure hell", which included "desperately trying to locate any of the embezzled paintings, trying to identify any assets and paying endless amounts to lawyers" to realize that "it was a fruitless exercise" because "no significant assets were found." Mr. Tümpel further addresses the particular betrayal by the defendant:

> I considered Newland a friend and I made the fateful mistake of trusting him. Newland completely fooled me. Besides the horrendous financial losses because of his crimes, the fact that I had been betrayed by a friend and had been so wrong in my judgement of his character, was one of the most devastating feelings I ever had in my life.

Mr. Tümpel concludes that "[a]part from the financial damage I believe the pain and emotional damage Newland has inflicted upon us can hardly be quantified and even less so compensated by a verdict." The sentence imposed must be sufficient to account for this significant harm, and the similar losses and betrayal suffered by others because of the defendant's participation in the Fraud Scheme.

2.   *The Defendant's Sophistication and Financial Expertise Warrant a Meaningful Term of Imprisonment*

The history and characteristics of the defendant warrant a sentence of imprisonment.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A). The defendant was a sophisticated business person, with advanced business degrees from prestigious universities and years of experience in management consulting, by the time he began working with Philbrick. The defendant had the experience and the know-how to recognize the first indications that Philbrick's business was premised on fraud, and he should have walked away immediately. Instead, driven by greed and ambition, as the defendant acknowledges in his letter to the Court, the defendant embraced Philbrick's Fraud Scheme. Any suggestion that the defendant was naïve or deceived by Philbrick is not credible. Nor is it an excuse that the defendant previously observed questionable and shady practices in the art market; those practices pale in comparison to the core of the Fraud Scheme perpetrated by the defendant and Philbrick. The defendant distanced himself from the Fraud Scheme when he took a new job in late 2018, but he did not exit—let alone denounce or take responsibility for— the Fraud Scheme. He continued to periodically advise Philbrick and continued to participate in defrauding FAP. Even as the collapse of the Fraud Scheme was imminent on the fall of 2019, the defendant lied to FAP.

The defendant has accepted responsibility for his conduct and expressed substantial remorse in his letter to the Court. But, the proposition that the defendant remained in the Fraud

21

Scheme because he wanted to try to keep it from collapsing by paying all the investors and lenders back in full and out of a sense of responsibility to FAP and other investors is delusional. This logic applies to many Ponzi schemes. So long as the market or investments do well, and all investors get paid back without any fraud being discovered, there is no harm, and the perpetrators of the Ponzi scheme get away with their crime. Any argument that the defendant stayed in the Fraud Scheme with good intentions is misguided.

In short, the defendant has accepted responsibility and expressed substantial remorse, which the Government credits.  But the defendant's actions during the Fraud Scheme, particularly given his sophistication, demonstrate a lack of concern about the impact of his action on others, suggesting the need for a sentence that promotes respect for the law.

3.   *The Sentence Imposed Should Reflect the Need for General Deterrence of Fraud in the Art Market*

Finally, the need for general deterrence and the need to avoid unwarranted sentencing disparities weigh in favor of a significant sentence of imprisonment. *See* 18 U.S.C. § 3553(a)(2)(B), (a)(6). A meaningful term of imprisonment is necessary to provide general deterrence and dissuade others—particularly those who transact in the art market with its extremely valuable assets and notable lack of oversight or regulation—from engaging in this type of crime. Conditions in the art market are ripe for abuse by fraudsters like Philbrick and the defendant. Buyers and sellers regularly transact through brokers for a number of reasons, including to maintain anonymity of the buyers and sellers and because of the expertise necessary to evaluate and handle the artworks. Thus, the art market traditionally operates on relationships and trust to maintain the confidentiality of the buyers and sellers and the price of artworks. In recent years, there has been an increasing trend to commoditize the art market. Buyers and sellers treat valuable art works as an alternative asset class to diversify their investment

22

portfolios and purchase percentage ownership stakes in an artwork with the intention of reselling the artwork for a profit within a short period of time. Moreover, artworks are increasingly used as collateral to finance loans for the purchase of other artworks. This combination of conditions—secrecy, valuable assets, lack of regulation, and the commoditization of art—creates opportunities for fraud schemes such as Philbrick and the defendant's scheme. A meaningful custodial sentence is necessary to send a corrective message and restore some measure of faith in the proper functioning of this valuable, but unregulated market.

The defendant argues that the goal of general deterrence is served by Philbrick's sentence alone and that personal, professional, and financial consequences are sufficient to achieve general deterrence. (Def. Mem. at 62-63). The Government disagrees. Although neither the leader nor instigator of the Fraud Scheme, the defendant was a significant participant in the Fraud Scheme, whose conduct ultimately increased the losses suffered by victims. A meaningful sentence of imprisonment, less than Philbrick's sentence of 84 months' imprisonment, is appropriate to deter others who similarly facilitate fraud in the art market, not just those who are primarily responsible for fraud. In particular, given the trend to commoditize art and the increased risk for fraud that the trend carries, there is a need to deter others who fill the role of financial expert, like the defendant, from engaging in fraud. A sentence of home confinement, as requested by the defendant, would have no significant deterrent effect on others, particularly given the scope of the Fraud Scheme here.[2] In contrast, a sentence of home confinement would send a message of impunity to others who act as "mere" facilitators to fraud in the art market.

---

[2] Moreover, the Government has confirmed with the Probation Office, and a sentence of home confinement to be served in the United Kingdom would not be enforceable. Accordingly, a sentence of home confinement would not provide any punishment or deterrence.

A non-custodial sentence would also create unwarranted sentencing disparities. The Court sentenced the defendant's co-conspirator Philbrick to 84 months' imprisonment. A non-custodial sentence here would be unjust and create unwarranted sentencing disparities given the defendant's role in the extensive Fraud Scheme, even considering the mitigating factors. In addition, while no comparison will ever be perfect, defendants in other art fraud cases in this District have received substantial sentences for less extensive fraud. In *United States v. Spoutz*, 16 Cr. 392 (LAK), Judge Kaplan sentenced convicted art fraudster Eric Spoutz to 41 months' imprisonment for selling dozens of fake artworks over a decade and thereby defrauding art collectors of nearly $1.5 million. In *United States v. John Re*, 14 Cr. 550 (PKC), Judge Castel sentenced convicted art fraudster John Re to 60 months in prison for selling fake artworks totaling a little over $2 million over many years. Though these cases involved fraudulent works of art, and occurred over a longer period of time, it shows the seriousness with which such crimes have been met in this District and it shows that additional serious sentences are necessary to combat fraud and dishonesty in the art market.

## <u>CONCLUSION</u>

For the reasons set forth above, the Government respectfully recommends that the Court impose a below-Guidelines but meaningful term of imprisonment that is less than Philbrick's sentence, a sentence that is sufficient but not greater than necessary to serve the purposes of sentencing.

Dated: New York, New York
       September 12, 2023

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney

                              By:    _____/s/_____
                                        Cecilia Vogel
                                        Jessica Feinstein
                                        Assistant United States Attorneys
                                        (212) 637-1084/1946